FUENTES, Circuit Judge, filed an opinion concurring in part, dissenting in part, and dissenting from the judgments, in which McKEE, Chief Judge, VANASKIE, SHWARTZ, KRAUSE, RESTREPO, and ROTH, Circuit Judges, joined. HARDIMAN, Circuit Judge, filed an opinion concurring in part and concurring in the judgments, in which FISHER, CHAGARES, JORDAN, and NYGAARD, Circuit Judges, joined.
*339 OPINION OF THE COURT
AMBRO, Circuit Judge,
announced the judgments of the Court and delivered the opinion for a unanimous Court with respect to Parts I and II, an opinion with respect to Parts III.A, III.B, III.C.l, III.C.2, and III.C.3.a, in which FUENTES, SMITH, GREENAWAY, Jr., VANASKIE, KRAUSE, and ROTH, Circuit Judges, joined, and an opinion with respect to Parts III.C.3.b, III.D, and IV, in which SMITH and GREENAWAY, Jr., Circuit Judges, joined.
TABLE OF CONTENTS
I. Background... 340
II. The Challengers’ Statutory Argument. . .341
III. The Challengers’ Constitutional Argument. . .343
A. The Second Amendment.. .343
B. The Framework for As-Applied Second Amendment Challenges... 345
C. Step One of the Marzzarella Framework.. .347
1. The Challengers Presumptively Lack Second Amendment Rights... 347
2. The Traditional Justification for Denying Felons the Right to Arms... 348
3. The Challengers’ Circumstances... 349
a. Distinguishing the Historically Barred Class...349
b. Application to the Challengers... 350
D. Step Two of the Marzzarella Framework.. .356
IV. Conclusion... 356
Federal law generally prohibits the possession of firearms by any person convicted in any court of a “crime punishable by imprisonment for a term exceeding one year.” 18 U.S.C. § 922(g)(1). Excluded from the prohibition is “any State offense classified by the laws of the State as a misdemeanor and punishable by a term of imprisonment of two years or less.” Id. § 921(a)(20)(B). And there is also an exemption for “[a]ny conviction which has been expunged, or set aside or for which a person has been pardoned or has had civil rights restored,” where the grant of relief does not expressly preserve the firearms bar. Id. § 921(a)(20).
In United States v. Marzzarella we adopted a framework for deciding facial and as-applied Second Amendment challenges. 614 F.3d 85 (3d Cir. 2010). Then in United States v. Barton we held that the prohibition of § 922(g)(1) does not violate the Second Amendment on its face, but we stated that it remains subject to as-applied constitutional challenges. 633 F.3d 168 (3d Cir. 2011).
Before us are two such challenges. In deciding them, we determine how a criminal law offender may rebut the presumption that he lacks Second Amendment rights. In particular, a majority of the Court concludes that Marzzarella, whose two-step test we reaffirm today, drives the analysis.[1] Meanwhile, a separate majority holds that the two as-applied challenges before us succeed. Part IV of this opinion sets out how, for purposes of future cases, to make sense of our fractured vote.
*340 I. Background
In 1996 Daniel Binderup began a consensual sexual relationship with a 17-year-old female employee at his bakery. Binder-up was 41 years old at the time and was aware that his employee was a minor, though she was over the legal age of consent in Pennsylvania (16). Two years later, Binderup pled guilty in a Pennsylvania state court to corrupting a minor, a misdemeanor subject to possible imprisonment for up to five years. 18 Pa. Cons. Stat. §§ 6301(a)(l)(I), 1104. Despite this, Binder-up’s sentence was the colloquial slap on the wrist: probation (three years) and a $300 fine plus court costs and restitution. His criminal record shows no subsequent offenses.
In 1990 police stopped Julio Suarez on suspicion of driving while intoxicated. During the stop, police noticed that Suarez was carrying a .357 Magnum handgun, as well as two “speed loaders” (devices that allow one to load all chambers of a revolver mechanically rather than inserting bullets one-by-one). He had no permit for the gun. He later pled guilty in a Maryland state court to unlawfully carrying a handgun without a license, a misdemeanor subject to possible imprisonment for “not less than 30 days and not [more than] three years or a fine of not less than $250 and not [more than] $2,500 or both.” Md. Code Ann. art. 27, § 36B(b) (1990) (now codified at Md. Code Ann. Crim. Law §4-203). Suarez nonetheless received a suspended sentence of 180 days’ imprisonment and a $500 fine, followed by a year of probation that he completed successfully. Eight years later, he was convicted again in a Maryland state court, this time for the state-law misdemeanor of driving under the influence of alcohol. Only the first of the convictions was subject to § 922(g)(1). Suarez now lives in Pennsylvania and since 1998 has led a life free of run-ins with the law. He holds a “Secret” federal government security clearance in connection with his job as a consultant for a government contractor.
Pennsylvania law disqualified Binderup and Suarez (collectively, the “Challengers”) from possessing firearms due to their convictions, but in 2009 they successfully petitioned the Pennsylvania courts to remove that prohibition. Federal law, however, continues to bar them from possessing firearms because their convictions have not been expunged or set aside, they have not been pardoned, and their civil rights have not been restored. See 18 U.S.C. § 921(a)(20); Logan v. United States, 552 U.S. 23, 37, 128 S.Ct. 475, 169 L.Ed.2d 432 (2007). Nor has the Attorney Ceneral granted them relief under 18 U.S.C. § 925(c), which allows her to remove the prohibition on a case-by-case basis “if it is established to [her] satisfaction” that a barred individual “will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest.”
Binderup and Suarez want to obtain guns to defend themselves and their families within their homes, but they have not attempted to do so for fear of violating § 922(g)(1). As a result, each filed a complaint in federal District Court (Binderup in the Eastern District of Pennsylvania, Suarez in the Middle District of Pennsylvania) seeking declaratory and injunctive relief. They claim as a matter of statutory construction that § 922(g)(1) does not apply to their convictions and, if it does, the statute is unconstitutional as applied. The Government opposed the lawsuits, and the parties in both cases filed cross-motions for summary judgment.
The District Courts rejected the Challengers’ statutory argument but held that § 922(g)(1) is unconstitutional as applied. The United States District Court for the Eastern District of Pennsylvania ruled *341 that § 922(g)(1) is unconstitutional as applied to Binderup because he “distinguished himself from those individuals traditionally disarmed as the result of pri- or criminal conduct and demonstrated that he poses no greater threat of future violent criminal activity than the average law-abiding citizen.” Binderup v. Holder, No. 13-cv-6750, 2014 WL 4764424, at *1 (E.D. Pa. Sept. 25, 2014). The Court did not analyze the constitutionality of § 922(g)(1) under any form of means-ends scrutiny, meaning it did not evaluate the law to assess whether its purpose — the end • sought — matches appropriately the means chosen to achieve it. Id. at *20-21. Depending on the importance of the rights involved and the nature of the burden on them, a law’s purpose may need to be only legitimate and the means to achieve it rational (called rational basis scrutiny); the purpose may need to be important and the means to achieve it substantially related (called intermediate scrutiny); or the purpose may need to be compelling and the means to achieve it narrowly tailored, that is, the least restrictive (called strict scrutiny). The latter two tests we refer to collectively as heightened scrutiny to distinguish them from the easily met rational basis test.
The United States District Court for the Middle District of Pennsylvania applied “a two[-]prong test for Second Amendment challenges” derived from our case law. Suarez v. Holder, — F.Supp.3d -, -, No. 1:14-CV-968, 2015 WL 685889, at *6-7 (M.D. Pa. Feb. 18, 2015). It found first that Suarez has Second Amendment rights notwithstanding his 1990 conviction because he demonstrated that “he is no more dangerous than a typical law-abiding citizen.” Id. at -, 2015 WL 685889 at *10. Then the Court applied means-ends scrutiny (in that case, strict scrutiny) and determined that § 922(g)(1) is unconstitutional as applied to him due to the severity of the burden it imposes. Id. at - n.9, 2015 WL 685889 at *7 n.9.
The Government appealed the summary judgments, and the Challengers’ cross-appealed the District Courts’ interpretations of the dispossession statute. The District Courts had jurisdiction under 28 U.S.C. §§ 1331, 1343, 1346, 2201, and 2202. We have appellate jurisdiction under 28 U.S.C. § 1292(a)(1).
Separate panels heard the appeals, and the Court sua sponte consolidated them for rehearing en banc. Our review is plenary. InterVest, Inc. v. Bloomberg, L.P., 340 F.3d 144, 158 (3d Cir. 2003).
II. The Challengers’ Statutory Argument
Section 922(g)(1), as noted, does not cover state misdemeanors “punishable by a term of imprisonment of two years or less.” 18 U.S.C. § 921(a)(20)(B). The Challengers argue that the exception includes any state misdemeanor that, like theirs, could have been punished by less than two years’ imprisonment.
We disagree. The exception in § 921(a)(20)(B) covers any crime that cannot be punished by more than two years’ imprisonment. It does not cover any crime that can be punished by more than two years in prison. In other words, § 921(a)(20)(B)’s use of “punishable by” means “subject to a maximum penalty of.” Although we have never explicitly defined it this way, we have at least twice relied on that understanding in interpreting the relationship between § 921(a)(20)(B) and § 922(g)(1). See United States v. Essig, 10 F.3d 968, 969-71 (3d Cir. 1993) (relying on an understanding of “punishable” that refers to whether the maximum potential sentence for a state misdemeanor exceeds two years, not whether a lesser sentence might be imposed); United States v. Schoolcraft, 879 F.2d 64, 69-70 (3d Cir. *342 1989) (explaining that a “misdemeanor punishable [by] up to seven years in prison” was “not a misdemeanor subject to a sentence of two years or less”). The D.C. Circuit’s opinion in Schrader v. Holder supports our decision, as it distinguishes crimes carrying a maximum term of imprisonment of more than two years from those “punishable by a term of imprisonment of two years or less” under § 921(a)(20)(B). 704 F.3d 980, 986 (D.C. Cir. 2013). And the Supreme Court drew'a similar distinction in Logan. See 552 U.S. at 34, 128 S.Ct. 475 (“[Section] 921(a)(20)(B) ... places within [§ 922(g)(l)’s] reach state misdemeanor convictions punishable by more than two years’ imprisonment.” (emphasis added)). Although this language is a dictum, “we should not idly ignore” its inclusion in the Supreme Court’s thorough discussion of § 921(a)(20)(B). In re McDonald, 205 F.3d 606, 612 (3d Cir. 2000).
Even if we were writing on a blank slate, we would reject the Challengers’ interpretation. When considering a crime’s potential punishment, we ordinarily refer only to the maximum punishment a court may impose. As the District Court in Suarez perceptively observed, when a crime has maximum and minimum possible punishments, we describe it as being “punishable” by that specific range; and when a crime references only a maximum punishment, “we ordinarily identify only the upper boundary” of that range, as “[a]ll lower possible terms of imprisonment are included by implication.” — F.Supp.3d at -, 2015 WL 685889, at *3. That is why we would not describe a crime carrying a specified term of imprisonment of up to three years as one “punishable by a term of imprisonment of two years or less.” By contrast, a misdemeanor carrying a ceiling of 18 months’ imprisonment would properly be described in the criminal law context as a crime “punishable by a term of imprisonment of two years or less” and on its face would not trigger the bar on gun possession. Accordingly, “subject to a maximum possible penalty of’ is the best reading of the phrase “punishable by” as used in § 921(a)(20)(B).
Our interpretation also makes sense in light of similar language in the United States Sentencing Guidelines. They provide three distinct grades of probation and supervised release violations — Grades A, B, and C — with Grade A violations treated most severely and Grade C least severely. See U.S.S.G. §§7Bl.l(a), 7B1.4(a). The Challengers’ interpretation of the phrase “punishable by” would erode those distinctions. Since Grade C applies only to offenses “punishable by a term of imprisonment of one year or less,” U.S.S.G. § 7Bl.l(a)(3), the Challengers’ interpretation would render offenses punishable by more than a year (Grade B), as well as even more serious offenses described as Grade A, eligible for Grade C treatment. This would be an absurd result.
In a last-ditch effort, the Challengers argue that § 921(a)(20)(B)’s use of “punishable” merits application of the rule of lenity (that ambiguous criminal laws be construed in favor of defendants) or the constitutional avoidance doctrine (that ambiguous statutory language be construed to avoid serious constitutional doubts). Both of these principles require ambiguity in the statute. See Voisine v. United States, 579 U.S. -, 136 S.Ct. 2272, 2282 n.6, 195 L.Ed.2d 736 (2016). As there isn’t any here, they give no plausible defense.
In sum, the Challengers’ argument that their convictions fall within § 921(a)(20)(B)’s exception to § 922(g)(1) has no traction. Their misdemeanor convictions were punishable by more than two years’ imprisonment. Hence they cannot seek refuge in § 921(a)(20)(B) and are subject to the bar of § 922(g)(1).
*343 III. The Challengers’ Constitutional Argument
A. The Second Amendment
The Challengers contend that, notwithstanding how we rule on their statutory argument, § 922(g)(1) is unconstitutional as applied to them. The Second Amendment states: “A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.” U.S. Const, amend. II. In District of Columbia v. Heller, the Supreme Court invalidated a law that “totally ban[ned] handgun possession in the home” and “require[d] that any lawful firearm in the home be disassembled or bound by a trigger lock at all times, rendering it inoperable.” 554 U.S. 570, 628, 128 S.Ct. 2783, 171 L.Ed.2d 637 (2008). In so doing, the Court held the Second Amendment protects an individual’s right, to possess a firearm “unconnected with militia service.” Id. at 582, 128 S.Ct. 2783. At the “core” of the Second Amendment is the right of “law-abiding, responsible citizens to use arms in defense of hearth and home.” Id. at 634-35, 128 S.Ct. 2783; Barton, 633 F.3d at 170-71; Marzzarella, 614 F.3d at 89. Two years after Heller, in McDonald v. City of Chicago, the Court held that the Fourteenth Amendment “incorporates the Second Amendment right recognized in Heller, because the right is “fundamental” to “our system of ordered liberty.” 561 U.S. 742, 778, 791, 130 S.Ct. 3020, 177 L.Ed.2d 894 (2010).
Although the Second Amendment guarantees an individual right, it is “not unlimited.” Heller, 554 U.S. at 626, 128 S.Ct. 2783; see United States v. Huitron-Guizar, 678 F.3d 1164, 1166 (10th Cir. 2012); Eugene Volokh, Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and a Research Agenda, 56 UCLA L. Rev. 1443, 1443 (2009).[2] Heller catalogued a non-exhaustive list of “presumptively lawful regulatory measures” that have historically constrained the scope of the right. 554 U.S. at 626-27 & n.26, 128 S.Ct. 2783; see Marzzarella, 614 F.3d at 91 (treating the “presumptively lawful regulatory measures” listed in Heller as “exceptions to the right to bear arms”). They include, but are not limited to, “longstanding prohibitions on the possession of firearms by felons and the mentally ill, [] laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, [and] laws imposing conditions and qualifications on the commercial sale of arms.” Heller, 554 U.S. at 626-27, 128 S.Ct. 2783; see McDonald, 561 U.S. at 786, 130 S.Ct. 3020. These measures comport with the Second Amendment because they affect individuals or conduct unprotected by the right to keep and bear arms. See Heller, 554 U.S. at 631, 635, 128 S.Ct. 2783 (suggesting that one is “disqualified from the exercise of Second Amendment rights” if he is “a felon” or “insane”). For example, bans on “weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns,” are permissible because those weapons fall outside the historical “scope of the right.” Id. at 625, 128 S.Ct. 2783; see United States v. *344 One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001801/., 822 F.3d 136, 141-44 (3d Cir. 2016); Marzzarella, 614 F.3d at 91-93.
As to cases involving burdens on Second Amendment rights, Heller did not announce which level of scrutiny applies but cautioned that challenges based on those rights are not beaten back by the Government supplying a rational basis for limiting them. 554 U.S. at 628 n.27, 128 S.Ct. 2783 (“If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect.”).
Some judges — including Judge Hardi-•man and those colleagues who join his opinion concurring in the judgments — and commentators have interpreted Heller to mean that any law barring persons with Second Amendment rights from possessing lawful firearms in the home even for self-defense is per se unconstitutional; that is, no scrutiny is needed. See Hardiman Op. Typescript at 13-19; Heller v. District of Columbia, 670 F.3d 1244, 1272-73 (D.C. Cir. 2011) (Kavanaugh, J., dissenting); Volokh, 56 UCLA L. Rev. at 1462; Joseph Blocher, Categoricalism and Balancing in First and Second Amendment Analysis, 84. N.Y.U. L. Rev. 375, 377, 380 (2009); see also United States v. McCane, 573 F.3d 1037, 1047-50 (10th Cir. 2009) (Tymkovich, J., concurring). But neither the Supreme Court nor any court of appeals has held that laws burdening Second Amendment rights evade constitutional scrutiny. Rather, when faced with an as-applied Second Amendment challenge, they agree that some form of heightened scrutiny is appropriate after it has been determined that the law in question burdens protected conduct. See, e.g., Marzzarella, 614 F.3d at 97-101 (applying intermediate scrutiny and, in the alternative, strict scrutiny to § 922(k)’s prohibition on possession of any firearm with a destroyed serial number); United States v. Williams, 616 F.3d 685, 692-93 (7th Cir. 2010) (applying intermediate scrutiny to § 922(g)(1)); United States v. Chovan, 735 F.3d 1127, 1141-42 (9th Cir. 2013) (same with respect to § 922(g)(9)’s disarmament of a domestic-violence misde-meanant); United States v. Chester, 628 F.3d 673, 682-83 (4th Cir. 2010) (same); United States v. Reese, 627 F.3d 792, 802-05 (10th Cir. 2010) (same with respect to § 922(g)(8)’s dispossession of certain persons subject to a domestic restraining order); Tyler v. Hillsdale Cty. Sheriff’s Dep’t, 775 F.3d 308, 326-29 (6th Cir. 2014) (applying strict scrutiny to § 922(g)(4)’s dispossession of any person “who has been committed to a mental institution”), reh’g en banc granted, opinion vacated (Apr. 21, 2015).
That individuals with Second Amendment rights may nonetheless be denied possession of a firearm is hardly illogical. It is no different than saying that the Government may prevent an individual with First Amendment rights from engaging in First Amendment, conduct — even conduct at the core of the First Amendment — if it makes the showing necessary to surmount heightened scrutiny. See, e.g., FEC v. Wis. Right to Life, 551 U.S. 449, 464-65, 127 S.Ct. 2652, 168 L.Ed.2d 329 (2007) (applying strict scrutiny to a statute prohibiting political speech at the core of the First Amendment); United Pub. Workers of Am. v. Mitchell, 330 U.S. 75, 102-03, 67 S.Ct. 556, 91 L.Ed. 754 (1947) (upholding the constitutionality of prohibitions on certain political activities by federal employees notwithstanding the First Amendment). Thus burdens on Second Amendment rights are subject to scrutiny in much the way that burdens on First Amendment rights are. Drake v. Filko, 724 F.3d 426, 434-36 (3d Cir. 2013); see NRA *345 Amicus Br. at 13-15 (asserting that burdens on core Second Amendment rights should be subject to strict scrutiny). Far from subjecting the Second Amendment to an “entirely different body of rules than the other Bill of Rights guarantees,” McDonald, 561 U.S. at 780, 130 S.Ct. 3020 (plurality opinion), this view uses “the structure of First Amendment doctrine [to] inform our analysis of the Second Amendment,” Marzzarella, 614 F.3d at 89 n.4; see id. (“Heller itself repeatedly invokes the First Amendment in establishing principles governing the Second Amendment.”).
Even if a law that “completely eviscerates the Second Amendment right” would be per se unconstitutional under Heller, Hardiman Op. Typescript at 18, § 922(g)(1) is no such law. Notwithstanding that provision (and as already noted), persons convicted of disqualifying offenses may under some circumstances possess handguns if (1) their convictions are expunged or set aside, (2) they receive pardons, or (3) they have their civil rights restored. 18 U.S.C. § 921(a)(20). And were Congress to fund 18 U.S.C. § 925(c), they could ask the Attorney General to lift the ban in their particular cases. Though some of these statutory avenues for relief are closed to Binderup and Suarez, see infra ■Part III.D, the remaining opportunities for them to overcome the ban contrast starkly with the District of Columbia law in Heller that made it a crime to carry an unregistered firearm and prohibited entirely the registration of handguns by individuals; there was nothing Mr. Heller could do to possess a handgun lawfully while outside his job as a District of Columbia special police officer guarding the Federal Judicial Center (in other words, he guarded judges). See 554 U.S. at 574,128 S.Ct. 2783 (citing D.C. Code §§ 7-2501.01(12), 7-2502.01(a), 7-2502.02(a)(4) (2001)); Parker v. District of Columbia, 478 F.3d 370, 373-74 (D.C. Cir. 2007); cf. United States v. Skoien, 614 F.3d 638, 645 (7th Cir. 2010) (en banc) (noting that disarmament under § 922(g)(9) is ordinarily not “perpetual” because of exceptions similar to those under § 922(g)(1)); Chovan, 735 F.3d at 1138 (same).
To say that § 922(g)(1) is per se unconstitutional as applied to anyone with Second Amendment .rights notwithstanding the statute’s escape hatches is a bridge too far. For starters, that would condemn without exception all laws and regulations containing preconditions for the possession of firearms by individuals with Second Amendment rights. By that reasoning, any law prohibiting an individual from possessing a handgun unless he passes a physical examination (to show he is capable of handling a firearm safely) or completes firearm training (to show he knows how to handle a firearm safely) would similarly be per-se unconstitutional, even if it is the least restrictive means of achieving a compelling government interest. There is no precedent for crippling the Government’s ability to regulate gun ownership in this manner. And to guarantee absolutely the ability to keep and bear arms even in cases where disarmament would survive heightened scrutiny would be a radical departure from our post-Heller jurisprudence and risk undermining many commonplace constitutional gun regulations.
B. The Framework for As-Applied Second Amendment Challenges
Unlike a facial challenge, an as-applied challenge “does not contend that a law is unconstitutional as written but that its application to a particular person under particular circumstances deprived that person of a constitutional right.” United States v. Mitchell, 652 F.3d 387, 405 (3d Cir. 2011) (quoting United States v. Marcavage, 609 F.3d 264, 273 (3d Cir. 2010)); see Ayotte v. Planned Parenthood of N. New England, *346 546 U.S. 320, 329, 126 S.Ct. 961, 163 L.Ed.2d 812 (2006) (“It is axiomatic that a statute may be invalid ■ as applied to one state of facts and yet valid as applied to another.” (internal quotation marks omitted)). Accordingly, our review of Binder-up’s and Suarez’s as-applied challenges requires us to consider whether their particular circumstances remove them from the constitutional sweep of § 922(g)(1).
Two of our precedents — Marzzarella and Barton — have guided how we approach as-applied Second. Amendment challenges. The former involved an as-applied challenge to 18 U.S.C. § 922(k), which bars the possession of any firearm with an obliterated serial number. It derived from Heller a “two-pronged approach to Second Amendment challenges” to firearm restrictions. 614 F.3d at 89. We first consider “whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment’s guarantee.” Id. If not, the challenged law must stand. But if the law burdens protected conduct, the proper course is to “evaluate the law under some form of means-end scrutiny,” id. that form in Marzzarella being intermediate scrutiny, id. at 97. “If the law passes muster under [the] standard [applied], it is constitutional. If it fails, it is invalid.” Id. at 89. As to § 922(k), we held that the law withstood intermediate scrutiny “even if it burden[ed] protected conduct” by fitting reasonably with the important “law enforcement interest in enabling the tracing of weapons via their serial numbers.” Id. at 95, 98. (We also noted in a dictum that the law would survive strict scrutiny, were that the test, because the provision serves a compelling interest through the least-restrictive means. Id. at 99-lba.)
Nearly every court of appeals has cited Marzzarella favorably. See, e.g., N.Y. State Rifle & Pistol Ass’n, Inc. v. Cuomo, 804 F.3d 242, 254 n.49 (2d Cir. 2015); Chovan, 735 F.3d at 1136-37; Nat’l Rifle Ass’n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 194-96 (5th Cir. 2012); GeorgiaCarry.org, Inc., v. Georgia, 687 F.3d 1244, 1260 n.34 (11th Cir. 2012); United States v. Greeno, 679 F.3d 510, 518 (6th Cir. 2012); Heller, 670 F.3d at 1252-53; Ezell v. City of Chicago, 651 F.3d 684, 701-04 (7th Cir. 2011); Chester, 628 F.3d at 680-83; Reese, 627 F.3d at 800-05. Indeed, it has escaped disparagement by any circuit court.
A year after Marzzarella we decided Barton, which involved a felon convicted under the provision now before us— § 922(g)(1). Barton raised facial and as-applied Second Amendment challenges to the firearm ban. After dispensing with his facial challenge and confirming the availability of as-applied challenges under the Second Amendment, we ruled that “the common law right to keep and bear arms did not extend to those who were likely to commit violent offenses.” 633 F.3d at 173. Because Barton’s prior convictions for possession of cocaine with intent to distribute and for receipt of a stolen firearm (as well as his illegal post-conviction sale of a firearm with an obliterated serial number) were “closely related to violent crime,” we concluded that he lacked Second Amendment rights. Id. at 174. Put another, way, Barton did not present “facts about himself and his background that distinguish[ed] his circumstances from those of persons historically barred from Second Amendment protections,” id. so he was “disqualified from the exercise of Second Amendment rights,” id. at 174 (quoting Heller, 554 U.S. at 635, 128 S.Ct. 2783), and his as-applied challenge could not succeed.
Read together, Marzzarella and Barton lay out a framework for deciding as-applied challenges to gun regulations. At step one of the Marzzarella decision *347 tree, a challenger must prove, per Barton, that a presumptively lawful regulation burdens his Second Amendment rights. This requires a challenger to clear two hurdles: he must (1) identify the traditional justifications for excluding from Second Amendment protections the class of which he appears to be a member, id. at 173, and then (2) present facts about himself and his background that distinguish his circumstances from those of persons in the historically barred class, id. at 174.
No doubt a challenger cannot prevail merely on his say-so. Courts must find the facts to determine whether he has adequately distinguished his circumstances from those of persons historically excluded from Second Amendment protections. Not only is the burden on the challenger to rebut the presumptive lawfulness of the exclusion at Marzzarella’s step one, but the challenger’s showing must also be strong. That’s no small task. And in cases where a statute by its terms only burdens matters {e.g., individuals, conduct, or weapons) outside the scope of the right to arms, it is an impossible one. But if the challenger succeeds at step one, the burden shifts to the Government to demonstrate that the regulation satisfies some form of heightened scrutiny, discussed further below, at step two of the Marzzarella analysis.
The Challengers, the District Court in Binderwp, and some of our colleagues claim that Marzzarella and Barton set standards for different types of as-applied Second Amendment challenges and that only Barton controls challenges to § 922(g)(1); Marzzarella has no role in the analysis. Our view is that, at least in pertinent part, each complements the other for an as-applied Second Amendment challenge to a presumptively lawful regulatory measure like § 922(g)(1). Barton identifies the two hurdles that an individual presumed to lack Second Amendment rights must overcome to rebut the presumption at step one of the Marzzarella framework.[3] Rebutting it permits testing the law or regulation under heightened scrutiny at step two. With this understanding, Marz-zarella and Barton are neither wholly distinct nor incompatible.
. C. Step One of the Marzzarella Framework

1. The Challengers Presumptively Lack Second Amendment Rights

Heller teaches that “longstanding prohibitions on the possession of firearms by felons” are “presumptively lawful.” 554 U.S. at 626 & 627 n.26, 128 S.Ct. 2783. Traditionally, “felons” are people who have been convicted of any crime “that is punishable by death or imprisonment for more than one year.” 1 Wayne R. LaFave, Substantive Criminal Law § 1.6 (2d ed. 2015); cf. Carachuri-Rosendo v. Holder, 560 U.S. 563, 567, 130 S.Ct. 2577, 177 L.Ed.2d 68 (2010) (quoting 18 U.S.C. § 3559(a)).
Section 922(g)(1) bars the possession of firearms by anyone convicted of “a crime punishable by imprisonment for a term exceeding one year.” This means that its prohibition extends to anyone convicted of a crime meeting the traditional definition of a felony, though Congress excluded anyone convicted of a “State offense classified by the laws of the State as a misdemean- or” unless it is punishable by more than *348 two years’ imprisonment. 18 U.S.C. § 921(a)(20)(B).
Binderup and Suarez were each convicted of a misdemeanor subject to § 922(g)(1): Binderup’s was punishable by up to five years’ imprisonment; Suarez’s by up to three years in prison. The Pennsylvania and Maryland legislatures classify their respective offenses as misdemeanors. However, based on their maximum possible punishments, they meet the traditional definition of a felony, and Congress treats them as felonies for purposes of § 922(g)(1). As a result, Binderup and Suarez are subject to a firearm ban that is, per Heller ', “presumptively lawful.”

2. The Traditional Justification for Denying Felons the Right to Arms

Turning to the first hurdle of step one, we look to the historical justification for stripping felons, including those convicted of offenses meeting the traditional definition of a felony, of their Second Amendment rights. “[M]ost scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous citizenry and that, accordingly, the government could disarm ‘unvirtuous citizens.’” United States v. Yancey, 621 F.3d 681, 684-85 (7th Cir. 2010); see, e.g., Saul Cornell & Nathan DeDino, A Well Regulated Right: The Early American Origins of Gun Control, 78 Fordham L. Rev. 487, 491-92 (2004); Saul Cornell, “Don’t Know Much about History”: The Current Crisis in Second Amendment Scholarship, 29 N. Ky. L Rev. 657, 679 (2002); David Yassky, The Second Amendment: Structure, History, and Constitutional Change, 99 Mich. L. Rev. 588, 626-27 (2000); Glenn Harlan Reynolds, A Critical Guide to the Second Amendment, 62 Tenn. L. Rev. 461, 480 (1995); Don B. Kates, Jr., The Second Amendment: A Dialogue, Law & Con-temp. Probs., Winter 1986, at 143, 146; Don B. Kates, Jr., Handgun Prohibition and the Original Meaning of the Second Amendment, 82 Mich. L. Rev. 204, 266 (1983). Several of our sister circuits endorse the “virtuous citizen”'justification for excluding felons and felon-equivalents from the Second Amendment’s ambit. See, e.g., United States v. Carpio-Leon, 701 F.3d 974, 979-80 (4th Cir. 2012) (“[Fjelons were excluded from the right to arms because they were deemed unvirtuous.” (internal quotation marks omitted)); Yancey, 621 F.3d at 684-85; United States v. Vongxay, 594 F.3d 1111, 1118 (9th Cir. 2010) (“[T]he right to bear arms does not preclude laws disarming ... unvirtuous citizens (i.e., criminals).” (quoting Kates, Jr., 49 Law & Contemp Probs. at 146)); United States v. Rene E., 583 F.3d 8, 15 (1st Cir. 2009) (“In the parlance of the republican politics of the time, these limitations were sometimes expressed as efforts to disarm the ‘unvirtuous.’ ”).
People who have committed or are likely to commit “violent offenses” — crimes “in which violence (actual or attempted) is an element of the offense,” Skoien, 614 F.3d at 642; see Voisine, 136 S.Ct. at 2280 — undoubtedly qualify as “unvirtuous citizens” who lack Second Amendment rights. Barton, 633 F.3d at 173-74; see United States v. Bena, 664 F.3d 1180, 1184 (8th Cir. 2011) (recognizing “a common-law tradition that the right to bear arms is limited to peaceable or virtuous citizens”); C. Kevin Marshall, Why Can’t Martha Stewart Have A Gun?, 32 Harv. J.L. & Pub. Pol’y 695, 727-28 (2009). But Heller recognized “longstanding prohibitions on the possession of firearms by felons,” not just violent felons. 554 U.S. at 626, 128 S.Ct. 2783. The category of “unvirtuous citizens” is thus broader than violent criminals; it covers any person who has committed a serious criminal offense, violent or nonviolent. See Skoien, 614 F.3d at 640-41; United States v. Everist, 368 F.3d 517, 519 *349 (5th Cir. 2004); Don B. Kates & Clayton E. Cramer, Second Amendment Limitations & Criminological Considerations, 60 Hastings L.J. 1339, 1363-64 (2009); see also Vongxay, 594 F.3d at 1115 (“[Fjelons are categorically different from the individuals who have a fundamental right to bear arms.”). To the extent Barton suggests that people who commit serious crimes retain or regain their Second Amendment rights if they are not likely to commit a violent crime, 633 F.3d at 174, it is overruled. See infra Part III.C.3.a.
The view that anyone who commits a serious crime loses the right to keep and bear arms dates back to our founding era. “Heller identified ... as a ‘highly influential’ ‘precursor’ to the Second Amendment the Address and Reasons of Dissent of the Minority of the Convention of the State of Pennsylvania to Their Constituents.” Skoien, 614 F.3d at 640 (quoting Heller, 554 U.S. at 604, 128 S.Ct. 2783). That report “asserted that citizens have a personal right to bear arms ‘unless for crimes committed, or real danger of public injury.’ ” Id. (emphasis added) (quoting 2 Bernard Schwartz, The Bill of Rights: A Documentary History 662, 665 (1971)). “[Cjrimes committed” — violent or not— were thus an independent ground for exclusion from the right to keep and bear arms. And there is reason to believe that felon disarmament has roots that are even more ancient. See Kates, Jr., 82 Mich. L. Rev. at 266 (“Felons simply did not fall within the benefits of the common law right to possess arms.”).
The takeaway: persons who have committed serious crimes forfeit the right to possess firearms much the way they “forfeit other civil liberties, including fundamental constitutional rights.” Barton, 633 F.3d at 175.

3. The Challengers’ Circumstances

a. Distinguishing the Historically Barred Class
Having identified the traditional justification for denying some criminal offenders the right to arms — that they are “unvirtuous” because they committed serious crimes — -we turn to how other criminal offenders may distinguish their circumstances from those of people who historically lacked the right to keep and bear arms. Barton suggests two ways to satisfy this second hurdle of step one: the first is' that a challenger may show that he never lost his Second Amendment rights because he was not convicted of a serious crime; the second is that a challenger who once lost his Second Amendment rights by committing a serious crime may regain them if his “crime of conviction is decades-old” and a court finds that he “poses no continuing threat to society.” 633 F.3d at 174.
We agree with Barton only insofar as it stands for the unremarkable proposition that a person who did not commit a serious crime retains his Second Amendment rights. Setting aside' what makes a crime “serious” in the Second Amendment context and whether § 922(g)(1) covers any non-serious crimes — issues we address in Part III.C.3.b and on which there is disagreement, see Fuentes Op. Typescript at 19-20 — being convicted of a non-serious crime does not demonstrate a lack of “virtue” that disqualifies an offender from exercising those rights.'
But our agreement with Barton ends there. We reject its claim that the passage of time or evidence of rehabilitation will restore the Second Amendment rights of people who committed serious crimes. That view stems from Barton’s misplaced focus at Marzzarella’s step one on the probability of violent recidivism and is inconsistent with the true justification *350 for the disarmament of people who commit serious crimes: they are “unvirtuous.” See supra Part III.C.2. A challenger’s risk of violent recidivism tells us nothing about whether he was convicted of a serious crime, and the seriousness of the purportedly disqualifying offense is our sole focus throughout Marzzarella’s first step.
There is no historical support for the view that the passage of time or evidence of rehabilitation can restore Second Amendment rights that were forfeited. To the extent Congress affords such a remedy in 18 U.S.C. § 921(a)(20) or 18 U.S.C. § 925(c), that is a matter of legislative grace; the Second Amendment does not require that those who commit serious crimes be given an opportunity to regain their right to keep and bear arms in that fashion. Indeed, the Supreme Court and our Court have recognized in the Second Amendment context that the Judicial Branch is not “institutionally equipped” to conduct “a neutral, wide-ranging investigation” into post-conviction assertions of rehabilitation or to predict whether particular offenders are likely to commit violent crimes in the future. United States v. Bean, 537 U.S. 71, 77, 123 S.Ct. 584, 154 L.Ed.2d 483 (2002); see Pontarelli v. U.S. Dep’t of the Treasury, 285 F.3d 216, 230-31 (3d Cir. 2002) (en banc); cf. S. Rep. 102-353, at 19 (1992) (doubting that even the Executive Branch could feasibly grant individualized exceptions to § 922(g)(1) based on an offender’s supposed rehabilitation because doing so is “a very difficult and subjective task” that “could have devastating consequences for innocent citizens if the wrong decision is made”).
In short, only the seriousness of the purportedly disqualifying offense determines the constitutional sweep of statutes like § 922(g)(1) at step one. To the extent Barton holds that people convicted of serious crimes may regain their lost Second Amendment rights after not posing a threat to society for a period of time, it is overruled.
b. Application to the Challengers
We now'consider whether the Challengers have shown that their crimes are not serious. As a preliminary matter, we note that Judge Fuentes, those colleagues joining his opinion dissenting from the judgment, and the Government deny the possibility of successful as-applied Second Amendment challenges to § 922(g)(1). See, e.g., Gov’t Binderup Br. at 14; Gov’t Suarez Br. at 15; Fuentes Op. Typescript at 18-40. In their view, § 922(g)(1), at least in its current form, is constitutional in all its applications because it does not burden the Second Amendment rights of felons or felon-equivalents who, because of their convictions, lack Second Amendment rights. Put another way, they believe that all crimes subject to § 922(g)(1) are disqualifying because their maximum possible punishments are conclusive proof they are serious.
But that view puts the rabbit in the hat by concluding that all felons and misde-meanants with potential punishments past a certain threshold lack the right to keep and bear arms when, despite their maximum possible punishment, some offenses may be “so tame and technical as to be insufficient to justify the ban.” United States v. Torres-Rosario, 658 F.3d 110, 113 (1st Cir. 2011). Heller confirms such a showing is possible, as it describes prohibitions on the possession of firearms by felons as only “presumptively lawful.” 554 U.S. at 626-27 & n.26, 128 S.Ct. 2783. Unless flagged as irrebutable, presumptions are rebuttable. See Barton, 633 F.3d at 173; Williams, 616 F.3d at 692. Indeed, under the approach of Judge Fuentes and those colleagues who join his opinion dissenting from the judgments, the Government could make an end-run around the *351 Second Amendment and undermine the right to keep and bear arms in contravention of Heller. A crime’s maximum possible punishment is “purely a matter of legislative prerogative,” Rummel v. Estelle, 445 U.S. 263, 274, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980), subject only to “constitutional prohibitions on irrational laws,” Heller, 554 U.S. at 628 n.27, 128 S.Ct. 2783; see United States v. Walker, 473 F.3d 71, 79 (3d Cir. 2007). Yet Heller teaches that the Government needs more than a rational basis “to overcome the right to keep and bear arms.” 554 U.S. at 628 n.27, 128 S.Ct. 2783; see Marzzarella, 614 F.3d at 95-96. Therefore, to determine whether the Challengers are shorn of their Second Amendment rights, Heller requires us to consider the maximum possible punishment but not to defer blindly to it.
At the same time, there are no fixed criteria for determining whether crimes are serious enough to destroy Second Amendment rights. Unlike the “historically unprotected categories of speech” that are First Amendment exceptions “long familiar to the bar,” United States v. Stevens, 559 U.S. 460, 468, 470, 130 S.Ct. 1577, 176 L.Ed.2d 435 (2010), the category of serious crimes changes over time as legislative judgments regarding virtue evolve. For example, though only a few exceedingly serious crimes were “felonies” at early common law, by the time of our country’s founding “many new felonies were added by English statute.” 1 Wharton’s Criminal Law § 17 (15th ed. 2015); see, e.g., 4 William Blackstone, Commentaries *18 (“[N]o less than a[] hundred and sixty [actions] have been declared by act of parliament to be felonies without benefit of clergy; or, in other words, to be worthy of instant death.”); Francis Bacon, Preparation for the Union of Laws of England and Scotland, in 2 The Works of Francis Bacon, Lord Chancellor of England 163-64 (1841) (listing dozens of felonies, including “[wjhere a man stealeth certain kinds of hawks” or “invocates wicked spirits”). The upshot is that “exclusions need not mirror limits that were on the books in 1791” to comport with the Second Amendment. Skoien, 614 F.3d at 641. Rather, we will presume the judgment of the legislature is correct and treat any crime subject to § 922(g)(1) as disqualifying unless there is a strong reason to do otherwise.
Here, upon close examination of the Challengers’ apparently disqualifying convictions, we conclude that their offenses were not serious enough to strip them of their Second Amendment rights. For starters, though the Challengers’ crimes meet the generic definition of a felony and Congress’s definition of a felony for purposes of § 922(g)(1), the Pennsylvania and Maryland legislatures enacted them as misdemeanors. Misdemeanors are, and traditionally have been, considered less serious than felonies; See Baldwin v. New York, 399 U.S. 66, 70, 90 S.Ct. 1886, 26 L.Ed.2d 437 (1970); misdemeanor, Black’s Law Dictionary (10th ed. 2014); 1 LaFave, Substantive Criminal Law § 1.6. Congress tried to ensure that only serious crimes would trigger disarmament under § 922(g)(1) by exempting from the ban any state-law misdemeanant whose crime was punishable by less than two years’ imprisonment. 18 U.S.C. § 921(a)(20)(B). But we believe that accommodation still paints with too broad a brush, for a state legislature’s classification of an offense as a misdemeanor is a powerful expression of its belief that the offense is not serious enough to be disqualifying.
This is not to say that state misdemeanors cannot be serious. No doubt “some misdemeanors are ... ‘serious’ offenses,” Baldwin, 399 U.S. at 70, 90 S.Ct. 1886, and “numerous misdemeanors involve conduct more dangerous than many felonies,” Tennessee v. Garner, 471 U.S. 1, 14, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). See Johnson v. *352 United States, 559 U.S. 133, 149-50, 130 S.Ct. 1265, 176 L.Ed.2d 1 (2010) (Alito, J., dissenting) (“At common law ... many-very serious crimes, such as kidnapping and assault with the intent to murder or rape, were categorized as misdemeanors.”). And the maximum possible punishment is certainly probative of a misdemeanor’s seriousness. But Congress may not overlook so generally the misdemeanor label, which, in the Second Amendment context, is also important.
Other considerations, however, confirm our belief that the Challengers’ crimes were not serious. As explained above, violent criminal conduct — meaning a crime “in which violence (actual or attempted) is an element of the offense,” Skoien, 614 F.3d at' 642; see Voisine, 136 S.Ct. at 2280—is disqualifying. See Part III.C.2. But neither Challenger’s offense had the use or attempted use of force as an element.[4] Though, as explained, it is possible for non-violent crimes to be serious, the lack of a violence element is a relevant consideration.
Also important is that each Challenger received a minor sentence by any measure: Binderup was sentenced to three years’ probation (a condition of which was to avoid contact with his employee) and a $300 fine plus court costs and restitution, while Suarez received a suspended sentence of 180 days’ imprisonment and a $500 fine. That is because severe punishments are typically reserved for serious crimes. Additionally, punishments are selected by judges who have firsthand knowledge of the facts and circumstances of the cases and who likely have the benefit of pre-sentence reports prepared by trained professionals. With not a single day of jail time, the punishments here reflect the sentencing judges’ assessment of how minor the violations were.
Finally, there is no cross-jurisdictional consensus regarding the seriousness of the Challengers’ crimes. Some states treat consensual sexual relationships between 41 and 17 year olds as serious crimes, see Gov’t Binderup Br. at 17-19 & n.4, but the vast majority of states do not, see Asaph Glosser et at., Statutory Rape: A Guide to State Laws and Reporting Requirements 6-7 (Dec. 15, 2004), available at https:// aspe.hhs.gov/sites/defaulVfiles/pdf/75531/ report.pdf (last visited Aug. 25, 2016). Binderup’s conduct arguably would have been criminal in a few other states because his 17-year-old sexual partner was his employee, yet it still would have been legal in many states. Similarly, though some states punish the unlicensed carrying of a concealed weapon as a serious crime, see Gov’t Suarez Br. at 16-17 n.5, more than half prescribe a maximum sentence that does not meet the threshold of a traditional felony (more than one year in prison) and others do not even require a specific credential to carry a concealed weapon, see Thomson Reuters, 50 State Survey: Right to Carry a Concealed Weapon (Statutes) (October 2015); U.S. Gov’t Accountability Off., States’ Laws and Requirements for Concealed Carry Permits Vary Across Nation 73-74 (2012), available at http:// www.gao.gov/assets/600/592552.pdf (last visited Aug. 25, 2016); Law Ctr. to Prevent Gun Violence, Concealed Weapons Permitting, http://smartgunlaws.org/gun-laws/ *353 pofiey-areas/fireams-in-public-places/ concealed-weapons-permitting/ (last visited Aug. 25, 2016). Were the Challengers unable to show that so many states consider their crimes to be non-serious, it would be difficult for them to carry their burden at step one. But because they have shown that there is no consensus regarding the seriousness of their crimes, their showing at step one is that much more compelling.[5]
In sum, the Challengers have carried their burden of showing that their misdemeanors were not serious offenses despite their maximum possible punishment.[6] This leads us to conclude that Binderup and Suarez have distinguished their circumstances from those of persons historically excluded from the right to arms. That, in turn, requires the Government to meet some form of heightened scrutiny at the second step of the Marzzarella framework.
D. Step Two of the Marzzarella Framework
Next, we consider whether § 922(g)(1) survives, heightened scrutiny as applied. On this record, it does not. No doubt § 922(g)(1) is intended to further the government interest of promoting public safety by “preventing armed mayhem,” Skoien, 614 F.3d at 642, an interest that is both important and compelling. But whether we apply intermediate scrutiny or strict scrutiny — and we continue to follow the lead of Marzzarella in choosing intermediate scrutiny, 614 F.3d at 97 — the Government bears the- burden of proof on the appropriateness of the means it employs to further its interest. See, e.g., Bd. of Trs. of State Univ. of N.Y. v. Fox, 492 U.S. 469, 480, 109 S.Ct. 3028, 106 L.Ed.2d 388 (1989); Johnson v. California, 543 U.S. 499, 505, 506 n.1, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005).
Here the Government falls well short of satisfying its burden — even under intermediate scrutiny. The record before us consists of evidence about the Challengers’ backgrounds, including the time that has passed since they last broke the law. It contains no evidence explaining why ban *354 ning people like them (ie., people who decades ago committed similar misdemeanors) from possessing firearms promotes public safety. The Government claims that someone like Suarez is “particularly likely to misuse firearms” because he belongs to a category of “potentially irresponsible persons,” Gov’t Suarez Br. at 27-28, and that someone like Binderup is “particularly likely to commit additional crimes in the future,” Gov’t Binderwp Br. at 35. But it must “present some meaningful evidence, not mere assertions, to justify its predictive [and here conclusory] judgments.” Heller, 670 F.3d at 1259. In these cases neither the evidence in the record nor common sense supports those' assertions.
The Government relies on a number of off-point statistical studies to argue that it is reasonable to disarm the Challengers because of their convictions. It notes that felons generally commit violent crimes more frequently than nonfelons, see Bureau of Justice Statistics, U.S. Dep’t of Justice, Recidivism of Prisoners Released in 1991, at 6 (2002), and that the “denial of handgun purchases [to convicted felons] is associated with a reduction in risk for later criminal activity of approximately 20-30%,” Mona A. Wright et al, Effectiveness of Denial of Handgun Purchase to Persons Believed to Be at High Risk for Firearm Violence, 89 Am. J. of Pub. Health 88, 89 (1999). But these studies estimate the likelihood that incarcerated felons will reoffend after their release from prison. The Challengers were not incarcerated and are not felons under state law; they are state-law misdemeanants who spent no time in jail. The Government cannot draw any reasonable conclusions about the risk posed by their possession of firearms from such obviously distinguishable studies. It claims that even criminals placed on probation rather than sent to prison have a heightened risk of recidivism, but the study it cites found that, “[generally, the risk of recidivism was highest during the first year after admission to probation,” and that “[a]s released prisoners and probationers age, they tend to exhibit lower rates of recidivism.” Iowa Div. of Crim. & Juvenile Justice Planning, Recidivism Among Iowa Probationers 2 (July 2005), available at http://publications.iowa.gov/ 15032/ (last visited Aug. 25, 2016). Binder-up’s and Suarez’s offenses are 20 and 26 years old, respectively, so that study tells us little, if anything, about the risk of recidivism in these cases.[7]
The Government also claims to have studies of particular relevance to each Challenger’s situation, but this argument too misses the mark. As to Binderup, the Government cites studies from several states that it contends would classify him as a sex offender on account of his criminal conduct. See Gov’t Binderup Br. at 33-34; see also id. at 28 n.8 (citing a Pennsylvania study showing that individuals convicted of *355 certain sexual offenses have a 50-60% chance of rearrest within three years of release from prison). Binderup unsurprisingly disputes that label. We need not delve into the weeds here, as, much like the more general studies discussed above, the sex-offender specific studies focus on people who were incarcerated. It is not helpful to draw inferences about the usefulness of disarming Binderup from those off-point studies.
As to Suarez, the Government emphasizes that persons arrested for “weapons offenses” are rearrested at high rates, Gov’t Suarez Br. at 30 & nn.10-11 (citing studies), and relies on a study indicating that California handgun purchasers in 1977 “who had prior convictions for nonviolent firearm-related offenses such as carrying concealed firearms in public, but none for violent offenses,” were more likely than people with no criminal histories to be charged later with a violent crime, see Garen J. Wintemute et al, Prior Misdemeanor Convictions as a Risk Factor for Later Violent and Firearm-Related Criminal Activity Among Authorized Purchasers of Handguns, 280 Am. Med. Ass’n 2083, 2086 (1998). Yet that study only addresses the risk of recidivism within 15 years of a conviction for an unspecified “nonviolent firearm-related offense[ ].” Id. at 2086. Common sense tells us that recidivism rates would change with the passage of an additional 11 years (Suarez was convicted 26 years ago) and vary based on the circumstances of the prior conviction.
This is not to say that empirical studies are irrelevant to as-applied Second Amendment challenges. Parties may use statistics to show that people who commit certain crimes have a high (or low) likelihood of recidivism that warrants (or does not warrant) disarmament, even decades after a conviction. In these cases, empirical studies could have demonstrated an appropriate fit between the Challengers’ total disarmament and the promotion of public safety if they contained reliable statistical evidence that people with the Challengers’ backgrounds were more likely to misuse firearms or were otherwise irresponsible or dangerous. The Government simply presented no such evidence.[8]
Additionally, that federal law gives Binderup and Suarez opportunities to escape the effect of § 922(g)(1) does not save the statute from unconstitutionality under the circumstances. For starters, several avenues are closed to them altogether: they may not apply for relief under § 925(c) because that provision has been unfunded for years, see Logan, 552 U.S. at 28 n.1, 128 S.Ct. 475; and Suarez is ineligible for expungement or the restoration of his civil rights, see Md. Code, Crim. P., § 10-105; Logan, 552 U.S. at 31-32, 128 S.Ct. 475. Those avenues that remain open to them do not satisfy even intermediate scrutiny. Binderup’s record may be expunged only after he reaches age 70 (or is dead for three years), 18 Pa. Cons. Stat. § 9122(b), but as there is no evidence showing it is reasonable to ban Binderup from possessing a firearm today, there is certainly no evidence to show that it is reasonable to keep that ban in place until his 70th birthday. The only remaining op *356 tion is for Binderup and Suarez to receive pardons from the Governors of Pennsylvania and Maryland, respectively. (Pardons are, as already noted, an independent ground for relief from the firearm disability in § 922(g)(1), and Binderup must receive a pardon to restore his civil rights. See 42 Pa. Cons. Stat. § 4502(a)(3).) But the Government has presented no evidence or explanation as to why a Governor’s decisions about pardons — “a classic example of unreviewable executive discretion,” Bowens v. Quinn, 561 F.3d 671, 676 (7th Cir. 2009)—are reasonably related to the risk posed by the Challengers’ possession of firearms. Though a pardon would reflect well on Binderup and Suarez, it is hardly reasonable to treat the absence of a pardon — rare by any measure — as adequate proof of a continuing need to disarm them indefinitely.
The Challengers’ isolated, decades-old, non-violent misdemeanors do not permit the inference that disarming people like them will promote the responsible use of firearms. Nor is there any evidence in the record to show why people like them remain potentially irresponsible after many years of apparently responsible behavior. Without more, there is not a substantial fit between the continuing disarmament of the Challengers and an important government interest. Thus, § 922(g)(1) is unconstitutional as applied to them.
IV. Conclusion
When sorting out a fractured decision of the Court, the goal is “to find a single legal standard” that “produce[s] results with which a majority of the [Court] in the case articulating the standard would agree.” United States v. Donovan, 661 F.3d 174, 182 (3d Cir. 2011) (quoting Planned Parenthood of Southeastern Pa. v. Casey, 947 F.2d 682, 693 (3d Cir. 1991), modified on , other grounds, 505 U.S. 833, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992)). We have at times “looked to the votes of dissenting [judges] if they, combined with votes from plurality or concurring opinions, establish a majority view on the relevant issue.” Id. And. when no single rationale explaining the result enjoys the support of a majority of the Court, its holding “may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n.15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (plurality opinion)).
Applying those interpretive tools here, the following is the law of our Circuit: (1) the two-step Marzzarella framework controls all Second Amendment challenges, including as-applied challenges to § 922(g)(1); (2) a challenger will satisfy the first step of that framework only if he proves that the law or regulation at issue burdens conduct protected by the Second Amendment; (3) to satisfy step one in the context of an as-applied challenge to § 922(g)(1)', a challenger must prove that he was not previously convicted of a serious crime; (4) evidence of a challenger’s rehabilitation or his likelihood of recidivism is not relevant to the step-one analysis; (5) as the narrowest ground supporting the Court’s judgments for Binderup and Suarez, the considerations discussed above will determine whether crimes are serious (i.e., disqualifying) at step one; and (6) if a challenger makes the necessary step-one showing, the burden shifts to the Government at step two to prove that the regulation at issue survives intermediate scrutiny.
In the cases before us, though Binderup and Suarez fail to show that their misdemeanor offenses are not subject to § 922(g)(1), they have rebutted the presumption that they lack Second Amendment rights by distinguishing their crimes of conviction from those that historically led to exclusion from Second Amendment *357 protections. This meets the first-step test of Marzzarella. At step two, the Government has failed to present sufficient evidence to demonstrate under even intermediate scrutiny that it may, consistent with the Second Amendment, apply § 922(g)(1) to bar Binderup and Suarez from possessing a firearm in their homes. Accordingly, we affirm the judgments of the District Courts.

. Parts III.A-C.3.a preserve the Marzzarella framework for deciding Second Amendment challenges and overrule aspects of Barton that are inconsistent with it. Seven Judges join those Parts expressly. Chief Judge McKee and Judges Shwartz and Restrepo, who join Judge Fuentes’s opinion, agree that Marzzarella controls the Second Amendment analysis, but do not join any of Part III because they reject the notion that the Marzzarella framework can be reconciled with any aspect of Barton's as-applied Second Amendment analysis, which they would overrule entirely.

. Professor Volokh's taxonomy of possible gun regulations divides them into
[ (1) T'what” restrictions (such as bans on machine guns, so-called "assault weapons,” or unpersonalized handguns), [(2)] "who” restrictions (such as bans on possession by felons, misdemeanants, noncitizens, or [juveniles]), [(3)] "where” restrictions (such as bans on carrying in public, in places that serve alcohol, or in parks, or bans on possessing [guns] in public housing projects), [(4)] "how” restrictions (such as storage regulations), [ (5) ] "when” restrictions (such as waiting periods), [(6)] "who knows” regulations (such as licensing or registration requirements), and [ (7) ] taxes and other expenses.
Volokh, 56 UCLA L. Rev. at 1443.

. Though Barton clarifies the types of showings that a challenger must make at step one of the Marzzarella framework, it defines too narrowly the traditional justification for why a criminal conviction may destroy the right to arms (i.e., it limits felon disarmament to only those criminals likely to commit a violent crime in the future) and, by extension, defines too broadly the class of offenders who may bring successful as-applied Second Amendment challenges to § 922(g)(1) {i.e., it allows people convicted of serious crimes to regain their right to arms). See infra Parts IIL.C.l-3.a.

. Though we look only to a crime's elements rather than to the way it actually was committed, we note as an aside that the District Court in Binderup explained that "[tjhere is simply nothing in the record here which would support a reasonable inference that [Binderup] used any violence, force, or threat of force to initiate or maintain the sexual relationship with his seventeen-year-old employee” or "that he even engaged in any violent or threatening conduct.” 2014 WL 4764424, at *22. Similarly, the District Court in Suarez described Suarez's misdemeanor as "minor and non-violent.” - F.Supp.3d at -, 2015 WL 685889, at *9.

. Judge Fuentes and those colleagues who join his opinion dissenting from the judgments caution that this approach is not "workable” and "places an extraordinary administrative burden on district courts,” Fuentes Op. Typescript at 2, 71, but the criteria we use to assess the seriousness of a misdemeanor subject to § 922(g)(1) — the elements of the offense, the actual sentence, and the state of the law — are easily administrable. These objective indications of seriousness are well within the ambit of judgment exercised daily by judges. Courts are also well suited to the task of identifying serious crimes in the Second Amendment context, as in other constitutional contexts the Judicial Branch is charged with discerning “objective criteria reflecting the seriousness with which society regards [an] offense.” Baldwin, 399 U.S. at 68, 90 S.Ct. 1886; see, e.g., Blanton v. City of North Las Vegas, 489 U.S. 538, 543-44, 109 S.Ct. 1289, 103 L.Ed.2d 550 (1989) (Sixth Amendment); Welsh v. Wisconsin, 466 U.S. 740, 753, 104 S.Ct. 2091, 80 L.Ed.2d 732 (1985) (Fourth Amendment); Smith v. United States, 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959) (Fifth Amendment).

. Our decision is limited to the cases before us, which involve state-law misdemeanants bringing as-applied Second Amendment challenges to § 922(g)(1). This is important because when a legislature chooses to call a crime a misdemeanor, we have an indication of non-seriousness that is lacking when it opts instead to use the felony label. We are not confronted with whether an as-applied Second Amendment challenge can succeed where the purportedly disqualifying offense is considered a felony by the authority that created the crime. On the one hand, it is possible to read Heller to leave open the possibility, however remote, of a successful as-applied challenge by someone convicted of such an offense. At the same time, even if that were so, the individual’s burden would be extraordinarily high — and perhaps even insurmountable. In any event, given that neither Challenger fits that description, we need not decide the question.

. As discussed, evidence of how individuals have lived their lives since committing crimes is irrelevant under Marzzarella's first step, as there is no historical support for rehabilitation being a consideration in determining whether someone has Second Amendment rights. However, at step two of the analysis the question is no longer whether the Challengers fall within the Second Amendment’s protections. They do. Our task now is to decide whether the Government can disarm them despite these protections. Whereas our obligation at step one is to draw constitutional lines — separating those who have Second Amendment rights from those who do not — at step two we must ask whether the Government has made a strong enough case for disarming a person found after step one to be eligible to assert an as-applied challenge. This turns in part on the likelihood that the Challengers will commit crimes in the future. Thus, under the right circumstances the passage of time since a conviction can be a relevant consideration in assessing recidivism risks.

. Judge Fuentes and those colleagues who join his opinion dissenting from the judgments suggest that our heightened scrutiny analysis boils down to the Challengers asking us to trust that they will not misuse firearms because we cannot make predictive judgments about the need to disarm the Challengers "with any degree of confidence.” Fuentes Op. Typescript at 55. We disagree. Under either form of heightened scrutiny it is the Government’s burden to prove that the restriction is appropriately tailored. The problem in our cases is that because the Government’s evidence sweeps so broadly, it does not establish that the restriction serves an important interest even as applied to people like the Challengers, let alone to the Challengers themselves.