# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

GAVIN J. BIRNEY, DELAWARE )
STATE SPORTSMEN'S )
ASSOCIATION, INC., and )
BRIDGEVILLE RIFLE & PISTOL )
CLUB, LTD., )
)
    Plaintiffs, )
) C.A. No. K23C-07-019 RLG
)
DELAWARE DEPARTMENT OF )
SAFETY AND HOMELAND )
SECURITY, NATHANIEL )
MCQUEEN, JR., in his official )
Capacity as Cabinet Secretary, )
Delaware Department of Safety and )
Homeland Security, and COL. )
MELISSA ZEBLEY, in her official )
Capacity as superintendent of the )
Delaware State Police, )
)
    Defendants. )

Submitted: July 18, 2025
Decided: August 29, 2025

## OPINION

*Upon Plaintiffs' Motion for Summary Judgment*
**GRANTED**

*Upon Defendants' Cross-Motion for Summary Judgment*
**DENIED**

Francis G.X. Pileggi, Esquire (argued); Katherine Welch, Esquire; Sean Brennecke, Esquire; Lewis Brisbois Bisgaard & Smith LLP, Wilmington, Delaware. *Attorneys for Plaintiffs Gavin J. Birney, Delaware State Sportsmen's Association, Inc., and Bridgeville Rifle & Pistol Club, Ltd.*

Zachary S. Stirparo, Esquire (argued); Nicholas D. Picollelli, Jr., Esquire; Department of Justice, Wilmington, Delaware. *Attorneys for Defendants Delaware Department of Safety and Homeland Security, Nathaniel McQueen, Jr., and Col. Melissa Zebley.*

**GREEN-STREETT, J.**

## I.    Introduction

In response to concerns over gun violence, the Delaware General Assembly passed legislation criminalizing the possession and purchase of certain firearms by anyone between the age of eighteen and twenty-one with limited exception. Two firearm-related associations, and a citizen of Delaware falling within that proscribed age range who wishes to purchase a firearm, challenge the constitutionality of that law under Article I, Section 20 of the Delaware Constitution. As the law violates the protections afforded to Delaware citizens under the Delaware Constitution, Plaintiffs' Motion for Summary Judgment is **GRANTED**. Defendants' Cross-Motion for Summary Judgment is **DENIED**.

## II.    Factual and Procedural Background

### A.    The passage of HB 451

HB 451, signed into law on June 30, 2022, amended two sections of Chapter 5, Title 11 of the Delaware Code: (1) § 1445; and (2) § 1448.[1] § 1445 prohibits the unlawful dealing of dangerous weapons, including firearms.[2] § 1448 outlines those individuals who "are prohibited from purchasing, owning, possessing, or controlling a deadly weapon or ammunition for a firearm within the State."[3] HB 451's

---

[1] Amend. Compl. Ex. A at 1, D.I. 8 (Oct. 18, 2023).

[2] See 11 Del. C. § 1445.

[3] 11 Del. C. § 1448(a).

amendments to those two sections sought to bar individuals between the ages of eighteen and twenty-one from purchasing, owning, or otherwise receiving certain firearms, including handguns.[4] In passing HB 451, the General Assembly noted, "there is conclusive scientific research that shows the human brain is still developing in young adults aged 18 to 21[,] which impacts their decision making, self-control, aggressive impulses, and risk-taking behavior."[5]

The changes to § 1445 sought by HB 451's amendments included replacing the word "adult" with the phrase "a person 21 years of age or older," and replacing the phrase "child under 18" with the phrase "person under 21."[6] HB 451's amendments also proposed changes to § 1448, including replacing the word "juvenile" to "person under the age of 21;" exempting "shotguns" and "muzzle loading rifles" from the general list of "deadly weapons" prohibited under § 1448(a)(5); creating several pathways for an eighteen-year-old to be exempted from § 1448(a)(5), including becoming an active member of the military, becoming a law-enforcement officer, or obtaining a concealed carry permit; and allowing an individual aged eighteen or older to possess or control a firearm.[7] The allowance for

---

[4] Amend. Compl. Ex. A at 1-4.

[5] Id. at 1.

[6] Id. at 2.

[7] Id. at 3.

possession of a firearm by someone eighteen years old had an expiration date of three years from the enactment of HB 451, and has since expired.[8]

The practical effect of HB 451 prohibits adults between the ages of eighteen and twenty-one from purchasing, or otherwise obtaining, any firearm that falls outside the definition of "shotgun" or "muzzle-loading rifle." As the allowance for possession of a firearm by a person eighteen years old has since expired, HB 451 also criminalizes the possession of those firearms by anyone under the age of twenty-one.[9] Section 2 of HB 451 explicitly outlines that, if any provision or application of HB 451 were to be held invalid, the rest of the act remains "severable."[10]

**B.      Plaintiffs file suit in Chancery Court, this Court, and Federal Court**

Plaintiff Gavin Birney, a resident of Delaware, wishes to acquire and possess firearms, but, because he has not yet reached the age of twenty-one, cannot legally do so since the passage of HB 451.[11] Mr. Birney belongs to the Delaware State Sportsmen's Association and the Bridgeville Rifle and Pistol Club, the other two named plaintiffs in this litigation (the "Organization Plaintiffs").[12] Those

---

[8] Id. at 4.

[9] 11 Del. C. § 1448(a)(5)(e).

[10] Amend. Compl. Ex. A at 4.

[11] Id. at 9.

[12] Id.

organizations assert that many of their members between the ages of eighteen and twenty-one would purchase and own firearms, if not for HB 451.[13]

Following the passage of HB 451, Plaintiffs filed a complaint in the Delaware Court of Chancery seeking a permanent injunction against the enforcement of the changes codified in HB 451.[14]  Plaintiffs named the Delaware Department of Safety and Homeland Security ("DDSHS"); the Cabinet Secretary of DDSHS, Nathaniel McQueen Jr.; and the superintendent of the Delaware State Police, Col. Melissa Zebley as the Defendants.[15]  Plaintiffs asserted the provisions of HB 451 violated both the federal Constitution and the Delaware Constitution.[16]

The Court of Chancery dismissed that complaint, *sua sponte*, finding that an injunction – or any other equitable relief – would be premature because no Delaware court held the provisions of HB 451 illegal.[17]  The Court of Chancery noted Plaintiffs essentially argued that Defendants would seek to enforce the provisions of HB 451 even if a court held those provisions to be unconstitutional.[18]  It further explained

---

[13] Id. at 9-10.

[14] Birney v. Delaware Dep't of Safety & Homeland Sec., 2022 WL 16955159, at *1 (Del. Ch. Nov. 16, 2022).

[15] Id.

[16] Id.

[17] Id. at *1-2.

[18] Id. at *2.

that the Organization Plaintiffs, represented by the same counsel, filed a similar complaint in a different case that the Court of Chancery ultimately dismissed for the same reason.[19] Accordingly, the Court of Chancery dismissed Plaintiffs' complaint, with leave to transfer to this Court.[20]

On November 23, 2022, Plaintiffs filed a complaint in this Court against Defendants, seeking a declaratory judgment that HB 451 violated the United States Constitution and the Delaware Constitution.[21] Defendants removed that litigation to the District Court for the District of Delaware.[22] On July 24, 2023, Plaintiffs filed the Complaint initiating the instant litigation.[23] The Complaint contained substantially similar pleadings as the complaint filed in 2022. Subsequently, the parties stipulated that Defendants would not seek a stay of the litigation provided Plaintiffs amended the Complaint to assert a claim under the Delaware Constitution only.[24] Plaintiffs filed the Amended Complaint on October 18, 2023, asserting a

---

[19] Id. at *2 ("The plaintiff organizations in the Prior Action *were the very same* as the Plaintiffs here. Those plaintiffs were represented by *the same counsel* as the Plaintiffs here. After oral argument, I dismissed that matter *sua sponte* subject to transfer to the law courts, where, I note, the plaintiffs ultimately received the relief they sought.") (emphasis original).

[20] Id. at *3.

[21] Case No. K22C-11-031 RLG, D.I. 1 (Nov. 23, 2022).

[22] Case No. K22C-11-031 RLG, D.I. 4 (Dec. 22, 2022).

[23] D.I. 1 (July 24, 2023).

[24] D.I. 7 (Sept. 13, 2023).

single count that HB 451 violates Plaintiffs' rights under Article I, Section 20 of the Delaware Constitution.[25] On November 27, 2023, the parties stipulated to stay the companion litigation in the District Court for the District of Delaware.[26]

## C. The instant litigation

Defendants filed their Answer on November 1, 2023.[27] On January 1, 2024, Plaintiffs filed a Motion for Summary Judgment, accompanied by an Opening Brief.[28] Defendants filed an Answering Brief on April 1, 2024.[29] Attached to Defendants' Answering Brief were two expert reports, spanning approximately 270 pages.[30] In light of those expert reports, Plaintiffs requested an extension of time to file their Reply.[31] Defendants opposed, arguing Plaintiffs sought an extension to correct deficiencies in their own filings by using the additional time to hire experts.[32]

---

[25] D.I. 8 (Oct. 18, 2023).

[26] Ex. A to Nov. 28, 2023 Letter to the Court, D.I. 12 (Nov. 28, 2023) (a copy of the stipulation between the parties regarding the pending federal litigation).

[27] D.I. 9 (Nov. 1, 2023).

[28] D.I. 15 (Jan. 25, 2024).

[29] D.I. 23 (Apr. 1, 2024).

[30] See Ex. A and B to Answering Br.

[31] Pls.' Mot. for Extension of Briefing Schedule, D.I. 24 (Apr. 11, 2024).

[32] Defs.' Resp. in Opp'n to Pls.' Mot. for Extension of Briefing Schedule at 2, 6, D.I. 26 (Apr. 16, 2024).

Over Defendants' objection,[33] the Court scheduled a hearing for Plaintiffs' motion for June 14, 2024.[34]

Plaintiffs filed their Reply on June 12, 2024, rendering the June 14th hearing date moot.[35] The Court scheduled oral argument for Plaintiffs' Motion for Summary Judgment for October 25, 2024.[36] On July 31, 2024, Defendants filed a Motion to Strike Portions of Plaintiffs' Reply,[37] which Plaintiffs opposed.[38] The Court converted the scheduled hearing on October 25th to oral argument on Defendants' Motion to Strike,[39] denying that motion via oral decision.[40] The Court permitted Defendants an opportunity to respond to Plaintiffs' experts by way of a sur-reply, which Defendants filed on February 10, 2025.[41]

---

[33] Letter to Court "re Decisions on Papers," D.I. 27 (Apr. 16, 2024).

[34] D.I. 25 (Apr. 12, 2024).

[35] Reply Br., D.I. 31 (Jun. 12, 2024).

[36] D.I. 33 (Jul. 1, 2024).

[37] D.I. 34 (Jul. 31, 2024).

[38] D.I. 39 (Aug. 27, 2024).

[39] D.I. 40 (Sept. 20, 2024) (Notice to parties cancelling oral argument for the Motion for Summary Judgment); D.I. 41 (Sept. 20, 2024) (Notice to parties scheduling oral argument for the Motion to Strike).

[40] D.I. 43 (Oct. 25, 2024).

[41] D.I. 50 (Feb. 10, 2025).

Plaintiffs filed several letters with the Court directing the Court's attention to national developments surrounding these type of firearm challenges.[42] On June 25, 2024, Plaintiffs wrote to inform the Court of the United States Supreme Court's decision in United States v. Rahimi,[43] presenting that case as "relevant controlling authority."[44] Plaintiffs filed another letter shortly thereafter,[45] alerting the Court to the Eighth Circuit's decision in Worth v. Jacobson concerning a similar law challenged in federal court under the Second Amendment.[46] Defendants filed a responsive letter, arguing that neither case offered any insight nor relevance to this litigation.[47] During the pendency of this litigation, Plaintiffs have filed an additional four letters advising the Court of various developments in the federal court system regarding laws challenged under the Second Amendment.[48]

---

[42] Plaintiffs did not similarly apprise the Court of federal cases taking the opposite position, see infra Section A-III, discussing Circuit Court decisions adverse to Plaintiffs' position.

[43] 602 U.S. 680 (2024).

[44] Letter to the Court, D.I. 32 (Jun. 25, 2024).

[45] Letter to the Court, D.I. 35 (July 31, 2024).

[46] 108 F.4th 677, 683 (8th Cir. 2024), cert. denied, 145 S. Ct. 1924 (2025).

[47] Defs.' Resp. to Plaintiffs' June 25th and July 31st Letters, D.I. 36 (Aug. 14, 2024).

[48] D.I. 42 (Oct. 21, 2024) (letter advising the Court that, although the United States Supreme Court vacated its holding in Lara v. Comm'r Pa. State Police, 91 F.4th 122 (3d Cir. 2024) (hereinafter "Lara I"), it made no comment on the merits of Lara I. Instead, Lara I was remanded to ensure it complied with the provisions of Rahimi); D.I. 46 (Jan. 22, 2025) (letter alerting the Court to the Third Circuit's decision in Lara v. Comm'r Pennsylvania State Police, 125 F.4th 428, 431 (3d Cir. 2025) (hereinafter "Lara II")); D.I. 49 (Feb. 5, 2025) (letter informing the Court of the Fifth

The Court heard oral argument on Plaintiffs' Motion for Summary Judgment on April 4, 2025.[49] In the parties' filings, the bulk of their respective arguments focused on whether this Court should evaluate HB 451's constitutionality using the test set forth by the United States Supreme Court in New York State & Rifle Association, Inc. v. Bruen.[50] As Bruen concerned a law challenged under the Second Amendment, and not Article I, Section 20 of the Delaware Constitution, the Court afforded the parties the opportunity to submit supplemental briefing on their respective arguments if the Court followed the test adopted by the Delaware Supreme Court to evaluate challenges under Article I, Section 20. Additionally, the Court noted that Defendants did not contend there were any issues of fact remaining – but had not moved for summary judgment. The Court further noted that, were the Court inclined to agree with Defendants' substantive arguments, Defendants' filings did not present a clear path forward for this litigation. Accordingly, the Court requested Defendants address that issue in their supplemental filing.

Defendants filed a Cross-Motion for Summary Judgment on April 10, 2025.[51] Plaintiffs filed a letter opposing Defendants' cross-motion, arguing that Lara II "is

Circuit's decision in Reese v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 127 F.4th 583, 586 (5th Cir. 2025)); D.I. 52 (Mar. 21, 2025) (a second letter to the Court regarding Reese).

[49] D.I. 54 (Apr. 4, 2025).

[50] 597 U.S. 1 (2022).

[51] D.I. 55 (Apr. 10, 2025).

binding on this Court regarding the issue of the minimum level of federal rights under the U.S. Constitution presented in the pending motion. There is no meritorious argument to support a contrary position."[52] Defendants submitted additional supplemental briefing on May 16, 2025,[53] which Plaintiffs opposed.[54] The parties filed opposing letters regarding their respective supplemental filings.[55] Plaintiffs' final letter – as of this writing – also included hunting guidelines published by the Delaware Department of Natural Resources and Environmental Control regarding prospective hunters under the age of twenty-one.[56]

## III. Standard of Review

10 Del. C. § 6501 permits this Court to declare rights.[57] "The declaration may either be affirmative or negative in form and effect, and such declaration shall have the force and effect of a final judgment or decree."[58] "The purpose of a declaratory

---

[52] D.I. 57 at 2 (Apr. 11, 2025).

[53] D.I. 58 (May 16, 2025).

[54] D.I. 60 (June 20, 2025).

[55] D.I. 62 (July 2, 2025) (Defs.' Letter regarding Pls.' Opposition to Defs.' Supplemental Post-Argument Briefing); D.I. 63 (July 18, 2025) (Pls.' Letter "Re: State's Rebuttal Letter to Your Honor").

[56] Ex. B to D.I. 63.

[57] See Delaware State Sportsmen's Ass'n v. Garvin, 196 A.3d 1254, 1260 (Del. Super. 2018) (citing 10 Del. C. §§ 6501 and 6502).

[58] 10 Del. C. § 6501.

judgment is to settle and to afford relief from uncertainty and insecurity with respects to rights, status[,] and other legal relations, and this purpose is to be liberally construed and administered."[59]

Under Superior Court Civil Rule 56(c), summary judgment is appropriate when the moving party establishes there are "no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law." The Court considers the facts in a light most favorable to the nonmoving party.[60] If the party bearing the burden to establish an essential element of her case at trial fails to establish that element, the other party is entitled to judgment as a matter of law.[61]

"Where the parties have filed cross motions for summary judgment and have not presented arguments to the Court that there is an issue of fact material to the disposition of either motion, the Court shall deem the motions to be the equivalent of a stipulation for decision on the merits."[62] "The standard for summary judgment

---

[59] Garvin, 196 A.3d at 1260 (internal quotations omitted) (quoting 10 Del. C. § 6512).

[60] Burkhart v. Davies, 602 A.2d 56, 59 (Del. 1991).

[61] Id. (quoting Celotex Corp. v. Catrett, 477 U.S. at 322-23 (1986)).

[62] Super. Ct. Civ. R. 56(h).

is not altered because the parties have filed cross-motions for summary judgment."[63] The Court must still determine if any genuine factual dispute exists.[64]

## IV.   **Analysis**

After oral argument, Defendants filed a Cross-Motion for Summary Judgment. Although Plaintiffs oppose the Court's consideration of that Motion, Plaintiffs do so on the belief that Defendants' motion "will require an Answering Brief and will likely generate a request for  Reply Brief as well as another oral argument," further delaying the disposition of Plaintiffs' Motion for Summary Judgment.[65]  That concern does not qualify as "argument to the Court that there is an issue of fact material to the disposition of either motion."[66]  Further, the Court does not find Defendants' motion requires an Answering Brief, Reply Brief, or additional oral argument.  The Court will consider Defendants' cross-motion, treating both parties' motions as a stipulation for a decision on the merits.  The Court finds no genuine issues of material fact remain, making summary judgment appropriate at this stage.

---

[63] Total Care Physicians, P.A. v. O'Hara, 798 A.2d 1043, 1050 (Del. Super. 2001) (internal quotations omitted) (quoting Haas v. Indian River Vol. Fire Co., 2000 WL 1336730, at *3 (Del. Ch. Aug. 14, 2000)).

[64] United Vanguard Fund, Inc. v. TakeCare, Inc., 693 A.2d 1076, 1079 (Del. 1997).

[65] Letter to the Court "re: response to State's April 10, 2025 Letter," D.I. 57 (May 16, 2025).

[66] Super. Ct. Civ. R. 56(h).

**A. The proper standard of review for challenges under Article I, Section 20 remains the test set forth by the Delaware Supreme Court**

Plaintiffs devoted much of their written filings to asserting that this Court must analyze a challenge under Article I, Section 20 of the Delaware Constitution using the test the United States Supreme Court articulated in <u>Bruen</u> for challenges under the Second Amendment.[67] Plaintiffs acknowledge that decisional law from the Delaware Supreme Court interpreting Article I, Section 20 instructed Delaware courts to apply intermediate scrutiny.[68] That binding precedent notwithstanding, Plaintiffs posit that <u>Bruen</u> requires Delaware courts adopt its "historical tradition" test.[69] As this Court lacks the authority to ignore Delaware Supreme Court precedent

---

[67] Mot. for Summ. J. at 6 ("Application of the <u>Bruen</u> test, rather than any prior test utilized in Delaware courts that incorporated intermediate scrutiny – that the U.S. Supreme Court has rejected – is appropriate in this matter."); Reply Br. at 4 ("The application of intermediate scrutiny to Plaintiffs' challenge under Article I, Section 20 of the Delaware Constitution rather than the <u>Bruen</u> test would make it much easier for the State to carry its burden, and[,] as a result, allow for more State restrictions on rights."); Pls.' Opposition to Defs.' Supplemental Post-Argument Briefing at 1 ("Now, the State asks this Court to defy controlling authority and apply the now-defunct intermediate scrutiny standard to a challenge for a statute infringing upon Delawareans' right to keep and bear common arms."); Letter to the Court "Re: State's Rebuttal Letter to Your Honor" at 5 ("Of course, Plaintiffs have demonstrated that a discussion of pre-<u>Bruen</u> precedent is academic, and <u>Bruen</u> and <u>Lara</u> mandate that HB 451 is an unconstitutional violation of Article I, Section 20.").

[68] Mot. For Summ. J. at 7; <u>see</u> <u>also</u> <u>Doe v. Wilmington Hous. Auth.</u>, 88 A.3d 654, 666 (Del. 2014) ("For the reasons which follow, we conclude that intermediate scrutiny is the proper level of constitutional review.").

[69] Mot. for Summ. J. at 8-9.

15

regarding interpretation of the Delaware Constitution, Plaintiffs' arguments to the contrary are unavailing.

## I. A brief history of Article I, Section 20 and its interpretation by the Delaware Supreme Court

The Delaware General Assembly codified Article I, Section 20 in 1987.[70] Under that section, "[a] person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use."[71] When compared to the text of the federal Second Amendment,[72] it becomes clear that "[on] its face, the Delaware provision is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including hunting and recreation."[73] Further, the Delaware Supreme Court has explained that "Article I, Section 20 is a source, independent from the Second Amendment, for recognizing and protecting individual rights."[74]

Viewing Section 20 as an independent source for an individual's rights becomes more apparent when considering the law's legislative history. "Section 20's

---

[70] Bridgeville Rifle & Pistol Club, Ltd. v. Small, 176 A.3d 632, 649 (Del. 2017).

[71] Del. Const. art. I, § 20.

[72] See U.S. Const. amend. II. ("A well[-]regulated militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.").

[73] Doe, 88 A.3d at 665.

[74] Id.

legislative history suggests that it was introduced in response to various state and federal court decisions that had recently challenged the view that the Second Amendment protected an *individual* right to bear arms for self-defense and that it applied to the states."[75] At least partially due to uncertainty about the extent of the individual rights enshrined in the Second Amendment, "the General Assembly intended to codify the *pre-existing* right of the people to keep and bear arms, including for self-defense – not create a brand new right."[76] "Delaware citizens have a constitutional right to keep and bear arms for the defense of themselves, their families, and their homes," separate and apart from any rights enshrined by the Second Amendment.[77]

"Although the right to bear arms under the Delaware Declaration of Rights is a fundamental right, [the Delaware Supreme Court has] already held that it is not absolute."[78] In Doe v. Wilmington Hous. Auth., the Delaware Supreme Court identified four prior cases in which it interpreted Section 20,[79] noting that only one

---

[75] Bridgeville, 176 A.3d at 648 (emphasis original) (citing House Debate on H.B. 554 at 1:26, 3:56, 133d Gen. Assem. (May 22, 1986) and Sen. Debate on H.B. 30 at 35:30, 38:00, 41:15, 134th Gen. Assem. (Apr. 16, 1987)).

[76] Id. (emphasis original).

[77] Griffin v. State, 47 A.3d 487, 488 (Del. 2012).

[78] Doe, 88 A.3d at 667 (citing Griffin, 47 A.3d at 488).

[79] See Griffin, 47 A.3d at 388; Short v. State, 586 A.2d 1203 (Del. 1991) (TABLE) (concerning a challenge to the constitutionality of Delaware's statute criminalizing possession of a deadly

of those cases cited "federal Second Amendment jurisprudence."[80] Although those three cases touched on claims relating to Section 20, none of those cases involved an in-depth analysis of the law's breadth. As explained in Doe, the Delaware Supreme Court's first decision articulating a standard of review for claims pertaining to Section 20 came in Griffin v. State.[81]

In Griffin, police arrested the defendant inside of his residence.[82] At the time of his arrest, the defendant possessed a knife, concealed in his pants. The State charged the defendant with carrying a concealed deadly weapon ("CCDW").[83] After a jury convicted him of that charge, the defendant appealed, and argued that Section 20 protected his right to carry a concealed deadly weapon inside of his own residence.[84]

---

weapon by a person prohibited); Smith v. State, 882 A.2d 762 (Del. 2005) (TABLE) (centering on whether Section 20 created a protected right to carry a concealed weapon); Dickerson v. State, 975 A.2d 791, 795 (Del. 2009) (examining the right to carry a concealed deadly weapon within the home. Ultimately, the Delaware Supreme Court deemed that issue moot because the defendant voluntarily left his property.).

[80] Doe, 88 A.3d at 664 (acknowledging that Short included a citation to United States v. Johnson, 497 F.2d 548 (4th Cir. 1974)).

[81] Doe, 88 A.3d at 665 (citing Griffin, 47 A.3d at 487).

[82] Griffin, 47 A.3d at 489.

[83] Id.

[84] Id.

The Griffin court looked to other jurisdictions for guidance, and identified the Wisconsin Supreme Court's decision in State v. Hamdan as instructive.[85]   "The Hamdan court adopted a three part test to decide, on a case-by-case basis, whether the CCDW statute [was] unconstitutional as applied."[86]   The Griffin court adopted that test, holding:

> First, the court must compare the strength of the state's interest in public safety with the individual's interest in carrying a concealed weapon.  Second, if the individual interest outweighs the state interest, the court must determine "whether an individual could have exercised the right in a reasonable, alternative manner that did not violate the statute."  Third, the individual must be carrying the concealed weapon for a lawful purpose.[87]

The Doe court reasoned that Griffin's "analysis employed heightened scrutiny in the context of a prosecution for carrying a concealed deadly weapon."[88]   That analysis provided guidance, but did not settle the question of what test Delaware courts must employ for further "constitutional review" under Section 20.[89] Crediting the "General Assembly's careful and nuanced approach," the Doe court concluded

---

[85] Id. (citing State v. Hamdan, 665 N.W.2d 785 (Wis. 2003)).

[86] Id.

[87] Id. (quoting Hamdan, 665 N.W.2d at 808).

[88] Doe, 88 A.3d at 666.

[89] Id.

"that intermediate scrutiny is the proper level of constitutional review."[90] It explained:

> In contrast, intermediate scrutiny requires more than a rational basis for the action, but less than strict scrutiny. Intermediate scrutiny seeks to balance potential burdens on fundamental rights against the valid interests of government. To survive intermediate scrutiny, governmental actions must "serve important governmental objectives and must be substantially related to the achievement of those objectives." The governmental action cannot burden the right more than is reasonably necessary to ensure the asserted governmental objective is met.[91]

The Doe court also examined federal jurisprudence concerning the Second Amendment, but noted that "although both Section 20 and the Second Amendment share a similar historical context that informs our analysis, the interpretation of Section 20 is not dependent upon federal interpretations of the Second Amendment."[92] Decided six years after the United States Supreme Court's first modern foray into the Second Amendment in District of Columbia v. Heller,[93] Doe recognized "Second Amendment Doctrine remains in its nascency."[94] Doe's

---

[90] Id.

[91] Id. (quoting Turnbull v. Fink, 668 A.2d 1370, 1379 (Del. 1995)).

[92] Id. at 663.

[93] 554 U.S. 570 (2008) (hereinafter, "Heller").

[94] Doe, 88 A.3d at 665 n.47 (internal quotations omitted) (quoting United States v. Marzzarella, 614 F.3d 85, 101 (3d Cir. 2010)).

examination of <u>Heller</u> largely focused on the historical analysis of the Second Amendment contained therein, with less attention paid to the legal analysis utilized by the <u>Heller</u> court.[95]

The Delaware Supreme Court's most recent opportunity to revisit its prescribed analytical framework for Section 20 arrived in its 2017 <u>Bridgeville</u> decision – approximately four-and-a-half years before the United States Supreme Court's seminal decision regarding the Second Amendment in <u>Bruen</u>. <u>Bridgeville</u> dealt with a challenge to policies enacted "by two different State agencies that [resulted] in a near total ban of firearms in Delaware's state parks and forests."[96] The <u>Bridgeville</u> court began by remarking that, "although federal courts are still grappling with whether there exists a Second Amendment right to carry a firearm outside the home, our Court settled the issue under our own constitution in our unanimous, en banc opinion in <u>Doe v. Wilmington Housing Authority</u>."[97] The <u>Bridgeville</u> court further explained that, although the Delaware Constitution expands upon the "baseline rights" provided by the federal Constitution, "Delaware judges

---

[95] <u>See id</u>. at 665 n.46.

[96] <u>Bridgeville</u>, 176 A.3d at 636.

[97] <u>Id</u>.

21

cannot faithfully discharge the responsibility of their office by simply holding that [the Delaware Constitution] stands in 'lock step' with the federal Bill of Rights."[98]

Bridgeville examined the "adoption of intermediate scrutiny in Doe," finding that test "consistent with the approach that federal circuits have employed when confronting facial challenges to statutes alleged to impinge on Second Amendment rights, yet do not qualify as total bans."[99]  Bridgeville explained that:

> Under a "two-pronged" framework forged by the Third Circuit in United States v. Marzzarella, [federal courts] first ask "whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee."  If yes, they "evaluate the law under some form of means-end scrutiny," such as intermediate scrutiny, to determine whether the statute or regulation can survive a facial challenge.[100]

The Bridgeville court grappled with what level of scrutiny to apply to regulations that "not just infringe – but destroy – the core Section 20 right of self-defense for ordinary citizens."[101]  Ultimately, after deciding it *could* have either analyzed the regulations under strict scrutiny or declared them categorically unconstitutional "total bans," the Bridgeville court deemed it appropriate to apply intermediate

---

[98] Id. at 642 n.47 (citing Dorsey v. State, 761 A.2d 807, 814 (Del. 2000)).

[99] Id. at 654 (citing Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 345 (3d Cir. 2016)).

[100] Id. (quoting Marzzarella, 614 F.3d at 85, 89).

[101] Id.

22

scrutiny because, "even assuming intermediate scrutiny applies, the Regulations still fail."[102]

Bridgeville outlined intermediate scrutiny as follows:

> Under intermediate scrutiny, the Agencies have the burden to: *first*, articulate their important governmental objectives in enacting the Regulations; *second*, demonstrate that the Regulations are substantially related to achieving those objectives; and, *third*, show that the Agencies have not burdened the fundamental right to bear arms in self-defense more than is reasonably necessary to ensure the asserted governmental objectives are met. The Agencies are required to show more than a "general safety concern."[103]

Consistent with the test employed by federal courts pre-Bruen, Bridgeville instructed Delaware courts to first consider whether the challenged law burdens conduct protected by Section 20.[104] Assuming the challenged law imposes such a burden, courts then determine which level of analysis – between intermediate scrutiny, strict scrutiny, and "total ban" – should apply. Burdens to "core rights" – notably, self-defense – likely trigger heightened scrutiny.[105] Bridgeville further observed that "courts are more likely to apply stricter scrutiny to regulations that limit the rights

---

[102] Id. at 656.

[103] Id. (emphasis original) (citing Doe, 88 A.3d at 666-67).

[104] Id.

[105] Id. (citing Heller v. District of Colombia, 670 F.3d 1244, 1257 (D.C. Cir. 2011) (hereinafter, "Heller II")).

of all citizens, instead of merely a 'narrow class of individuals who are not at the core of the Second Amendment.'"[106]  Of interest to the parties in this litigation, Bridgeville cited a Fifth Circuit ruling that restrictions on individuals under the age of twenty-one *did not* trigger heightened scrutiny, because those restrictions did "not disarm an entire community, but instead prohibit commercial handgun sales to 18-to-20-year-olds – a discrete category."[107]

Like Doe, Bridgeville elucidated several key principles that guide this Court's analysis of HB 451.  First, this Court cannot forgo a Delaware Constitution-based analysis merely because the challenged law may not survive a challenge under the Second Amendment in federal court.  Second, Delaware courts analyze challenges to Section 20 by applying either intermediate scrutiny, strict scrutiny, or "total ban" analysis.  Third, although federal jurisprudence surrounding the Second Amendment may prove persuasive, this Court's analysis must be based on the Delaware Supreme Court's interpretation of the Delaware Constitution.  Taken together, along with the axiomatic concept that this Court *must* follow Delaware Supreme Court's decisional law regarding Delaware statutory and constitutional law until the *Delaware Supreme*

---

[106] Id. (quoting United States v. Chester, 628 F.3d 673, 682-83 (4th Cir. 2010)).

[107] Id. at 655 n.125 (quoting Nat'l Rifle Ass'n of Am. Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, 700 F.3d 185, 205 (5th Cir. 2012)).

*Court* issues new guidance, this Court will apply the test described in Bridgeville to determine if HB 451 violates Section 20.

## II.  This Court cannot ignore Delaware Supreme Court jurisprudence in favor of adopting Bruen's historical framework test

Undeterred by Bridgeville's status as binding decisional law, Plaintiffs make several arguments for discarding the test outlined in Bridgeville in favor of applying Bruen's historical framework test.  First, Plaintiffs assert Delaware courts must apply Bruen because "Bruen provides more rights to Delawareans than the now[-]defunct 'two-step intermediate scrutiny framework' that developed in lower courts post-Heller."[108]  As Delaware cannot provide fewer rights than those enshrined in the federal Constitution, Plaintiffs posit the analytical framework Delaware courts apply to the Delaware Constitution cannot impose a lower burden of proof on the State than what the federal analogue of that test requires.[109]  Plaintiffs allege intermediate scrutiny "allowed a lower 'floor' which did not protect rights as much as the new Bruen test will."[110]  Plaintiffs further contend "it remains self-evident that the now-defunct intermediate scrutiny test for evaluating Second Amendment challenges is more deferential to government restrictions and allows for fewer individual rights to

---

[108] Mot. for Summ. J. at 8.

[109] Id. at 8-9.

[110] Id. at 9.

25

bear arms than would an application of the test the U.S. Supreme Court now requires."[111]

Although a defensible position, Plaintiffs' contention conflicts with the way at least some architects of Bruen envisioned the historical framework test being applied. Before joining the United States Supreme Court and lending his vote to the majority in Bruen, then-Judge Kavanaugh described a test focused on history and tradition:

> [J]ust because gun regulations are assessed by reference to history and tradition does not mean that governments lack flexibility or power to enact gun regulations. Indeed, governments appear to have *more* flexibility and power to impose gun regulations under a test based on text, history, and tradition than they would under strict scrutiny. After all, history and tradition show that a variety of gun regulations have co-existed with the Second Amendment right and are consistent with that right, as the Court said in Heller. By contrast, if courts applied strict scrutiny, then presumably very few gun regulations would be upheld. Indeed, Justice Breyer made this point in his dissent in Heller when he noted that the majority opinion had listed certain permissible gun regulations "whose constitutionality under a strict-scrutiny standard would be far from clear." So the major difference between applying the Heller history- and tradition-based approach and applying one of the forms of scrutiny is not necessarily the number of gun regulations that will pass muster.[112]

---

[111] Reply Br. at 2.

[112] Heller II, 670 F.3d at 1274 (Kavanaugh, J., dissenting) (emphasis original) (quoting Heller, 544 U.S. at 688 (Breyer, J., dissenting)).

Though then-Judge Kavanaugh more directly highlighted the differences between a "history-and-tradition test" compared to strict scrutiny, his comparison applies with similar force to applying *any* "of the forms of scrutiny."[113] The framework, as originally intimated in Heller and clarified in Bruen, intended to change the way courts analyze challenges to the Second Amendment.[114] Bruen, like Heller and McDonald before it, sought to create a test that "will be more determinate" and "much less subjective."[115] In his concurrence in Rahimi, Justice Kavanaugh articulated that the lack of judicial consistency – not the evidentiary burden placed on either party – created the main problem with a "heightened scrutiny" or "balancing" approach.[116]

Justice Alito's concurrence in Bruen underscored that point, writing that "means-end" scrutiny "places no firm limits on the ability of judges to sustain any law restricting the possession or use of a gun."[117] In the United States Supreme Court's first true clarification of the Bruen framework, the majority opinion in

---

[113] Id.

[114] Id.

[115] Id. (quoting McDonald v. City of Chicago, 561 U.S. 742, 804 (2010)) (Scalia, J. concurring)).

[116] Rahimi, 602 U.S. at 733 (Kavanaugh, J., concurring) ("Because it is unmoored, the balancing approach presents the real 'danger' that 'judges will mistake their own predilections for the law.'") (quoting A. Scalia, *Originalism: The Lesser Evil*, 57 U. CIN. L. REV. 849, 863 (1989)).

[117] Bruen, 597 U.S. at 77 (Alito, J., concurring).

Rahimi stressed that "if a challenged regulation fits within that tradition, it is lawful under the Second Amendment."[118] Bruen itself explains its framework as substituting the burden of the government from showing its "regulation promotes an important interest" to demonstrating "the regulation is consistent with this Nation's historical tradition of firearm regulation."[119] Absent from these analyses of the merits – of either some form of scrutiny analysis or the "history-and-tradition" framework – is commentary that Bruen would lead to either a "heavier burden" or a raising of the "'floor' of minimum rights."[120]

Even assuming that the Bruen court's intent centered on expanding the rights afforded to individuals under the Second Amendment – rather than just creating a different test to analyze the extent of those rights – Delaware courts are not bound to interpret the Delaware Constitution in a way that mirrors federal courts' interpretation of the federal Constitution. Certainly, Delaware cannot provide fewer rights to individuals than what the Second Amendment provides.[121] That principle

---

[118] Rahimi, 602 U.S. 691.

[119] Bruen, 597 U.S. at 17.

[120] See Reply Br. at 1.

[121] Bridgeville, 176 A.3d at 642 ("And our Delaware Constitution may provide 'broader or additional rights' than the federal constitution, which provides a 'floor' or baseline rights.") (quoting Randy J. Holland, *State Jury Trials and Federalism: Constitutionalizing Common Law Concepts*, 38 CAL. U. L. REV. 373, 375 (2004)).

does not necessitate Delaware adopting the same test as the federal courts –

especially considering Section 20 affords more rights to individuals by virtue of its

broader text. Bruen, like Heller and McDonald before it, changed the federal

conversation around Second Amendment rights. Whether that conversation

ultimately leads to a net-expansion of rights under the Second Amendment remains

to be seen.[122] The General Assembly's passage of Section 20 – prompted by

uncertainty as to how federal courts would interpret the Second Amendment –

intended to insulate Delaware from tidal shifts in the federal judiciary.[123]

So long as Delaware courts interpret Section 20 to provide at least as many

rights as the Second Amendment, Delaware courts are free to arrive at that

interpretation through any test the Delaware Supreme Court adopts.[124] The

Delaware Supreme Court has yet to adopt Bruen. Plaintiffs argue the test explained

---

[122] See, Section A-III, supra, containing a discussion of the circuit split regarding the rights of 18-20-year-olds to purchase and carry firearms.

[123] See Bridgeville, 176 A.3d at 648 n.79.

[124] Defendants argue that Delaware courts are technically free to interpret Section 20 to provide *fewer* rights than the Second Amendment. Defendants concede the practical effect of such an interpretation would be Section 20 violating the Second Amendment, and, thus, violating the federal Constitution. See Tr. of Oral Argument at 30-32. Both sides agree any law that violates either Section 20 or the Second Amendment would be unenforceable. Because the Court finds the challenged provisions of HB 451 violate Section 20 – thus mooting any issue of whether Section 20 provides fewer rights to 18-20-year-olds than the federal Constitution in this context– the Court will not explore the practicability of interpreting Section 20 in a way that conflicts with the Second Amendment.

in <u>Bridgeville</u> and <u>Doe</u> mirrored the test employed by federal courts at that time.[125] Accordingly, Plaintiffs posit this Court is similarly free – if not required – to use a test that mirrors the current state of federal jurisprudence around the Second Amendment.[126] That argument misunderstands the latitude this Court has to decline to follow Delaware Supreme Court precedent.

This Court remains bound by the Delaware Supreme Court. Although <u>Bridgeville</u> and <u>Doe</u> certainly took guidance from federal decisional law, those Delaware decisions are not dependent on the outcomes of those federal cases. None of those federal cases analyzed Section 20. To the extent that any federal court has ever analyzed Section 20, that analysis remains controlled by Delaware Supreme Court jurisprudence. A federal court could find the Delaware Supreme Court's interpretation of Section 20 violates the federal Constitution in a given case, effectively overruling the application of Section 20 by virtue of the supremacy clause.[127] That ruling would not, however, force the Delaware Supreme Court to adopt a different test. Accordingly, federal decisional law surrounding the Second Amendment does not force – or even permit – this Court to ignore Delaware Supreme Court precedent and apply a different test of its choosing.

---

[125] Mot. for Summ. J. at 6-7.

[126] <u>Id</u>.

[127] U.S. Const. art. IV, cl. 2.

Further evidence that the test adopted by the Delaware Supreme Court stands separate and apart from its federal counterpart can be found in the text of Heller itself. Heller explicitly rejected any "'interest-balancing approach,'" holding, "[w]e know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "'interest-balancing' approach."[128] As noted in Bruen, Heller "expressly rejected the application of any 'judge-empowering inquiry' that 'asks whether the statute burdens a protected interest in a way or to an extent that is out of proportion to the statute's salutary effects upon other important governmental interests.'"[129] From that perspective, the Delaware Supreme Court had the opportunity to follow federal precedent and reject intermediate scrutiny post-Heller, and declined to do so. This Court cannot revisit that declination.

## III. Federal courts have struggled to apply Bruen consistently

If this Court *were* permitted to discard the test adopted by the Delaware Supreme Court – which it is not – this Court remains unconvinced the Bruen framework would be preferable for analyzing Section 20. "The historical approach

---

[128] Heller, 554 U.S. at 634.

[129] Bruen, 597 U.S. at 22 (quoting Heller, 554 U.S. at 634 (quoting Heller, 554 U.S. at 689-690) (Breyer, J., dissenting)); see also State v. Sieyes, 225 P.3d 995, 1005 (Wash. 2010) (the Washington Supreme Court, when confronted with a challenge brought under Washington's analogue to the federal Second Amendment, "[followed] Heller in declining to analyze [the challenged statute] under any level of scrutiny.").

is not perfect."[130]  "Courts have struggled with this use of history in the wake of Bruen."[131]  Many federal courts, bound to follow Bruen, have expressed confusion and overall dissatisfaction with its framework.[132]  At least one other state supreme court, when asked to adopt Bruen for its own constitutional analysis, flatly rejected that invitation.[133]  Certainly, reasonable minds might differ over which analytical framework would ultimately provide the most consistent and correct rulings.  Given the reaction of the courts that have already grappled with Bruen, however, this Court cannot say Bruen provides a preferable framework to the one adopted by the Delaware Supreme Court.  That said, history and federal precedent offer valuable guidance in this area of the law – particularly given the dearth of Delaware decisional law surrounding Section 20.

---

[130] Rahimi, 602 U.S. at 734 (Kavanaugh, J., concurring).

[131] Id. at 739 (Barrett, J., concurring); see also id. at 743 (Jackson, J., concurring) ("The message that lower courts are sending now in Second Amendment cases could not be clearer.  They say there is little method to Bruen's madness."  Justice Jackson went on to note that lower courts' applications of Bruen has not yielded judicial consistency.).

[132] See id. at 743 n.1 (collecting cases).

[133] See State v. Wilson, 543 P.3d 440, 454 (Hawaii 2024) ("As the world turns, it makes no sense for contemporary society to pledge allegiance to the founding era's culture, realities, laws, and understanding of the Constitution.").

As of this writing, six of the federal circuit courts have considered the Second Amendment rights of 18-to-20-year-olds post-Rahimi. The Third,[134] Fifth,[135] and Eighth[136] Circuits have struck down laws they found infringed upon the rights of 18-to-20-year-olds. The Fourth,[137] Tenth,[138] and Eleventh[139] Circuits upheld strikingly similar laws, finding restrictions on the Second Amendment rights of 18-to-20-year-olds fit within the Bruen framework. A review of those six decisions proves instructive for this Court's analysis of HB 451, and further highlights some of the shortcomings of a fixation on "history and tradition" when analyzing firearm regulations.

---

[134] Lara II, 125 F.4th at 231.

[135] Reese, 127 F.4th at 586.

[136] Worth, 108 F.4th 677 at 683.

[137] McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 140 F.4th 568, 572 (4th Cir. 2025).

[138] Rocky Mountain Gun Owners v. Polis, 121 F.4th 96, 104 (10th Cir. 2024) (dissolving an injunction preventing the enforcement of a law setting the minimum age to purchase guns in Colorado at 21).

[139] Nat'l Rifle Ass'n v. Bondi, 133 F.4th 1108, 1111 (11th Cir. 2025).

### a. The Third, Fifth, and Eighth Circuits struck down laws similar to HB 451

The Third Circuit decided <u>Lara II</u> on remand after the United States Supreme Court issued its decision in <u>Rahimi</u>.[140]  Pennsylvania residents challenged "the combined operation of three statutes, [through which] the Commonwealth of Pennsylvania effectively [banned] 18-to-20-year-olds from carrying firearms outside their homes during a state of emergency."[141]  First considering whether 18-to-20-year-olds enjoyed protection under the Second Amendment, the Third Circuit found, "like other references to 'the people' in the Constitution, 'the term unambiguously refers to all members of the political community, not an unspecified subset.'"[142]  Noting that a historic view of "the people" would "consist solely of white, landed men," <u>Lara II</u> held that whether an individual qualified as part of the "people" at some previous time in history did not factor into a modern analysis of constitutional rights.[143]  <u>Lara II</u> further reasoned that "18-to-20-year-olds are among 'the people' for other constitutional rights[,] such as the right to vote, freedom of

---

[140] <u>Lara II</u>, 125 F.4th at 431.

[141] <u>Id</u>.

[142] <u>Id</u>. at 435 (quoting <u>United States v. Verdugo-Urquidez</u>, 494 U.S. 259, 265 (1990)).

[143] <u>Id</u>. at 437; <u>see</u> <u>Range v. Att'y Gen. United States</u>, 124 F.4th 218, 229 (3d Cir. 2024) (noting that, at the time of the Founding, the government "disarmed groups they distrusted like Loyalists, Native Americans, Quakers, Catholics, and Blacks").

speech, the freedom to peaceably assemble [sic] and to petition the government, and the right against unreasonable searches and seizures."[144]

Proceeding through the Bruen framework, Lara II found Pennsylvania failed to find a historical analogue to its current statutes prohibiting 18-to-20-year-olds from possessing a firearm during a state of emergency.[145] Although such laws existed, Lara II discredited their relevance because those laws were relatively modern creations.[146] Accordingly, Lara II concluded a prohibition on 18-to-20-year-olds' ability to carry a firearm – even if only during the limited timeframe of a state of emergency – violated the Second Amendment.[147]

Worth grappled with a combination of Minnesota statutes that banned "those under 21 years old from carrying handguns in public."[148] As in Lara II, Worth began by recognizing 18-to-20-year-olds as part of "the people."[149] In so doing, the Eighth Circuit held:

---

[144] Id.

[145] Id. at 442.

[146] Id. at 440-41.

[147] Id. at 445.

[148] Worth, 108 F.4th at 683.

[149] Id. at 688.

> Ordinary, law-abiding, adult citizens that are 18 to 20-year-olds [sic] are members of the people because: (1) they are members of the political community under <u>Heller's</u> "political community" definition; (2) the people has a fixed definition, though not fixed contents; (3) they are adults; and (4) the Second Amendment does not have a freestanding, extratextual dangerousness catchall.[150]

<u>Worth</u> went on to reject the notion that 18-to-20-year-olds fell into a category of presumptively dangerous people allowing for their disarmament, stating the challenged regulation "cannot be justified on a dangerousness rationale."[151]

<u>Reese</u> centered on a challenge by several individuals and firearm-advocacy groups of two federal statutes prohibiting the sale of firearms to 18-to-20-year-olds. In <u>Reese</u>, the Fifth Circuit described the defendant's argument that those absent from the political community at the time of the founding remained excluded from "the people" as "incompatible with Second Amendment precedent, nonsensical when considered against the backdrop of American suffrage, and contradicted by the history of firearm use at the founding."[152] <u>Reese</u> distinguished historical laws prohibiting "minors" from possessing a firearm from modern laws prohibiting possession by 18-to-20-year-olds – even when those historical laws applied to anyone under the age of twenty-one – because eighteen-year-olds are now

---

[150] <u>Id</u>. at 689.

[151] <u>Id</u>. at 695.

[152] <u>Reese</u>, 127 F.4th at 592.

considered adults.[153]   Reese further explained that Rahimi established laws disarming "categories of persons" apply "*only* once a court has found that *the defendant* represents a credible threat to the physical safety of another."[154]

**b.    The Fourth, Tenth, and Eleventh Circuits have upheld restrictions on the Second Amendment rights of 18-to-20-year-olds**

Rocky Mountain Gun Owners concerned near-identical legislation as HB 451.[155]  The Tenth Circuit similarly rejected the contention that 18-to-20-year-olds were not encompassed in "the people."[156]   Thus, the Rocky Mountain court considered "whether the government has the power to disable the exercise of a right that he otherwise possesses."[157]   That court held, however, that "laws imposing conditions and qualifications on the sale and purchase of arms do not implicate the plain text of the Second Amendment."[158] As the challenged Colorado statute did not restrict the ability of individuals to carry a firearm based on their age, the Tenth

---

[153] Id.

[154] Id. at 598 (internal quotations omitted) (emphasis original) (quoting Rahimi, 602 U.S. at 698).

[155] Rocky Mountain Gun Owners, 121 F.4th at 105.

[156] Id. at 116.

[157] Id. (internal quotations omitted) (quoting Kanter v. Barr, 919 F.3d 437, 453 (7th Cir. 2019) (Barrett, J., dissenting)).

[158] Id. at 120.

Circuit found the statute at issue did not infringe on any Second Amendment rights.[159]

The Eleventh Circuit took a somewhat different approach analyzing a Florida statute, reasoning that minors cannot enter into contracts.[160] As those under twenty-one were considered minors during the Founding era, the Bondi court held that minors' inability to contract would have precluded them from purchasing firearms.[161] In critiquing a dissenting opinion, the majority in Bondi further opined that those under twenty-one are still minors in the context of Second Amendment rights.[162] Bondi concluded that states may afford different rights to different age groups, and that permitting 18-to-20-year-olds some constitutional rights did not afford them the full panoply of rights enjoyed by those over the age of twenty-one.[163] In McCoy, the Fourth Circuit largely followed the same rationale, with an arguably heavier reliance on minors' inability to contract forming the backbone of the court's decision.[164] Of note, Bondi, McCoy, and Rocky Mountain Gun Owners analyzed

---

[159] Id.

[160] Bondi, 133 F.4th at 118.

[161] Id.

[162] Id. at 1125.

[163] Id.

[164] McCoy, 140 F.4th at 579.

laws that prohibited the sale or purchase of handguns by those under twenty-one, *without* analyzing their right to possess or carry a handgun.

Aside from providing context for the inconsistent results <u>Bruen's</u> framework has produced thus far, the fact that six of the circuit courts have split evenly on the question of whether 18-to-20-year-olds have a right to purchase a firearm underscores the need for Delaware courts to interpret the Delaware Constitution as a basis for rights separate and apart from its federal counterpart. Uncertainty around federal application of the Second Amendment helped prompt the passage of Section 20.[165] Deciding the merits of this case on Second Amendment grounds alone – as Plaintiffs suggest this Court must do, despite the removal of their Second Amendment Claim to federal court[166] – would create the same type of uncertainty the drafters of Section 20 sought to avoid.

## B. The Court will apply intermediate scrutiny to HB 451

Having dispensed with Plaintiff's request to disregard Delaware Supreme Court precedent, the Court next turns to applying the test set forth in <u>Bridgeville</u>. At the Court's request, the parties submitted supplemental briefing on this issue. Plaintiffs argue the "total ban" analysis referenced in <u>Bridgeville</u> applies to HB 451

---

[165] <u>Bridgeville</u>, 176 A.3d at 648 n.79.

[166] <u>See</u> Letter to the Court "Re: Response to State's April 10, 2025 Letter" at 2 (arguing the Third Circuit's decision in <u>Lara II</u> binds this Court to rule in Plaintiffs' favor).

because it "bans all 18-20 year-old [sic] Delawareans from purchasing or owning firearms, however commonly used, other than a shotgun or muzzle-loading rifle."[167] Defendants argue this Court must apply intermediate scrutiny, as it did in its most recent opportunity to apply Bridgeville to a challenge under Section 20.[168] Plaintiffs posit that, ultimately, whichever standard this Court applies should produce the same result – a finding that HB 451 violates Section 20.[169]

Bridgeville instructs this Court to "first ask whether the challenged law imposes a burden falling within the scope of" Section 20.[170] Defendants have not contested that HB 451 imposes a burden on rights otherwise protected by HB 451 – namely the right to self-defense.[171] Clearly, HB 451 prevents 18-to-20-year-olds from exercising the same rights a 21-year-old enjoys under Section 20 by virtue of prohibiting them from purchasing, owning, or possessing most firearms.[172]

---

[167] Pls.' Opp'n to Defs.' Supp. Post-Argument Br. at 8.

[168] Ans. Br. at 13 (citing Garvin, 196 A.3d at 1261).

[169] Pls.' Opp'n to Defs.' Supp. Post-Argument Br. at 11.

[170] Bridgeville, 176 A.3d at 655.

[171] See Ans. Br. at 13 (Defendants acknowledge this step of the test, but essentially gloss over it and proceed to apply intermediate scrutiny.).

[172] See Heller, 554 U.S. at 629 (noting that handguns are "the quintessential self-defense weapon."); see also Bridgeville, 176 A.3d at 655–56 (referring to the right of self-defense as one of the core tenants of Section 20).

Given HB 451 imposes a burden falling within the scope of Section 20, the Court next considers what level of scrutiny should apply. On this front, the Court agrees with Plaintiffs that the challenged provisions of HB 451 do not survive any level of scrutiny. Thus, the Court follows the same path as Bridgeville in applying intermediate scrutiny and reaching a conclusion, rather than considering the merits of applying a higher level of scrutiny.[173]

## I. Defendants have articulated an important governmental objective justifying HB 451

The first prong of an intermediate scrutiny analysis requires Defendants to "articulate their important governmental objectives in enacting" the challenged law.[174] Defendants couch the governmental interest underlying HB 451 as concern "about the safety of those under the age of 21 years old and the safety of their communities."[175] HB 451 itself states "there is conclusive scientific research that shows the human brain is still developing in young adults aged 18 to 21 which impacts their decision making, self-control, aggressive impulses, and risk taking

---

[173] See Bridgeville 176 A.3d at 655–56 (analyzing the challenged regulation under intermediate scrutiny, determining the challenged regulations could not survive that level of scrutiny, and declining to conduct further analysis despite considering that "one might legitimately argue that we need not apply any level of scrutiny.").

[174] Id. at 656.

[175] Ans. Br. at 14.

41

behaviors."[176]  Plaintiffs characterize Defendants' proffered interest as "general safety concerns" akin to those rejected in <u>Doe</u> and <u>Bridgeville</u>.[177]

HB 451 prohibits the possession or acquisition of a firearm by 18-to-20-year-olds.  This prohibition on possession extends everywhere, including into the home, which "infringes the fundamental right of responsible, law-abiding citizens to keep and bear arms for the defense of self, family, and home."[178]  Accordingly, Defendants "must show more than a general safety concern" as the "important governmental interest" advanced by HB 451.[179]

In <u>Bridgeville</u>, government agencies "presented no record support for what can only be characterized as the type of 'general safety concern' that [was] found inadequate in <u>Doe</u>."[180]  The defendants in <u>Doe</u> posited their important governmental interest concerned "protecting the health, welfare, and safety of all [Wilmington Housing Authority] residents, staff, and guests who enter onto [Wilmington Housing

---

[176] Compl. Ex. A at 1.

[177] Pls.' Opp'n to Defs.' Supp. Post-Argument Br. at 16; <u>but</u> <u>see</u> <u>Bridgeville</u> at 709 n.288 (Strine, C.J., dissenting) ("In fact, it appears no other courts have objected to general safety concerns when analyzing important government interests under intermediate scrutiny.").

[178] <u>Doe</u>, 88 A.3d at 667.

[179] <u>Id</u>.

[180] <u>Bridgeville</u>, 176 A.3d at 656.

Authority] property."[181]   The defendants explained how the challenged regulations advanced that governmental interest by arguing "an accidental discharge of a firearm may have serious fatal consequences and that dangers inhere in the increased presence of firearms."[182]   The <u>Doe</u> court rejected the defendants' justification as "a general safety concern" insufficient to justify the prohibition on possessing firearms contemplated by the challenged regulations.[183]

Unlike in <u>Bridgeville</u>, Defendants have provided a record to support their proffered governmental interest.   Contrary to <u>Doe</u>, Defendants have asserted more than a mere supposition that more firearms equate to more danger.   Defendants supplied the Court with expert reports citing crime statistics and neuroscience research.[184]   Though the experts focus much of their reports on historical context of laws restricting the rights of minors, these reports provide some record to suggest 18-to-20-year-olds commit firearm-related offenses at a higher rate than the general public.[185]   HB 451 itself notes, "the Statistical Analysis Center's Delaware Shootings

---

[181] <u>Doe</u>, 88 A.3d at 667.

[182] <u>Id</u>.

[183] <u>Id</u>.

[184] Ex. A to Ans. Br. at 18; Ex B. to Ans. Br. at 5-6; Ex. 1 to Defs.' Supplemental Br. on Cross-Motions for Summ. J. at 5-7.

[185] <u>See also</u> Ex. A to Mot. for Summ. J. at 1.

reports for the previous 3 years show [ ] that the most common age for shooters was between 18 to 21[,] which represents 33% of all shooters in 2020, 29% in 2019, and 32% in 2018."[186]

Defendants have demonstrated a sufficiently important governmental objective supporting the passage of HB 451. The General Assembly identified a subsection of the population that disproportionately committed firearm-related offenses, and sought to mitigate the commission of those offenses by designating them as "persons prohibited." The General Assembly made that identification based on both statistics and scientific research. Though Defendants could have provided a more robust record to support the General Assembly's findings, the Court finds Defendants have provided enough evidence to conclude HB 451's passage stemmed from an important governmental objective.

That objective differentiates itself from the objective rejected in Doe because it targets a specific subsection of the population, as opposed to the indiscriminate regulations present in Doe. Both Delaware's legislature and Congress have a long history of disarming specific subsections of the population that they deem pose a greater threat to society than members of the general public.[187] The Rahimi court

---

[186] Id.

[187] See 11 Del. C 1448(a) (designating as persons prohibited a wide range of population segments, including: any person convicted of a felony or crime of violence; any person who has been involuntarily committed, been found not guilty by reason of insanity, or found incompetent to stand trial; "any person who has been convicted for the unlawful use, possession[,] or sale of a narcotic,

acknowledged this history in upholding a provision of 18 U.S.C. § 922(g), pinpointing, "we do not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse."[188] Consistent with that tradition, Defendants have established an important governmental objective justifying HB 451.

## II. Defendants have demonstrated that HB 451 substantially relates to achieving the stated objective of preventing gun violence committed by 18-to-20-year-olds

The next step of intermediate scrutiny requires Defendants to "demonstrate that the [challenged law is] substantially related to achieving" its "important governmental objective."[189] As the defendants in Doe and Bridgeville failed to produce an important governmental objective, those cases did not thoroughly

---

dangerous drug[,] or central nervous system depressant or stimulant;" any person with a juvenile adjudication for a crime that would constitute a felony "until that person reaches the age of 25;" any person subject to a Family Court protection from abuse order; any person convicted of a crime of domestic violence; any person alleged to have committed a felony who becomes a fugitive of justice; any person possessing a subset of deadly weapons "who, at the same time, possess a controlled substance;" any person subject to a lethal violence protective order; or any person subject to an outstanding warrant related to a felony or crime of domestic violence); see also 18 U.S.C. § 922(g) (designating similar subsections of the population as persons prohibited from possessing a firearm).

[188] Rahimi, 602 U.S. at 698 (citing Heller, 554 U.S. at 626).

[189] Bridgeville, 176 A.3d at 656.

examine this prong of intermediate scrutiny.[190]  Perhaps drawing on the historical

practice of glossing over this prong, Defendants' Answering Brief devotes only a

single sentence to asserting that a portion[191] of HB 451 substantially relates to an

important governmental objective.[192]  Similarly, Plaintiffs provided this Court with

little guidance on this prong.[193]

Given HB 451's objective to limit access to firearms for 18-to-20-year-olds,

the challenged provisions are substantially related to that goal.  Though Defendants

arguably failed to carry their burden on this prong by virtue of barely addressing it

---

[190] See id. ("Moreover, the State proffers no basis upon which to conclude that public safety concerns justify a total ban in all acres of Delaware's parkland and forests...").

[191] Defendants take the position that Plaintiffs have not substantively challenged the provisions of HB 451 that amend 11 Del. C. § 1445.  See Ans. Br. at 10 n.2.  The amended sections of § 1445 prohibit the sale of a firearm to a person under twenty-one.  Though Plaintiffs certainly focus almost all of their attention on the amended provisions of § 1448, Plaintiffs refer to the amendments to both §§ 1445 and 1448 collectively as HB 451.  See Am. Compl. at 2 n.2.  As the amendments to § 1445 effectively prohibit anyone under twenty-one from purchasing a firearm, and as Plaintiffs' entire body of filings in this case takes issue with that prohibition, the Court cannot agree with Defendants' reading of Plaintiffs' filings.  Further, criminalizing the sale of firearms to someone under the age of twenty-one has the same practical effect as prohibiting the purchase of a firearm by someone under the age of twenty-one.  This distinction without a difference cannot be used as justification for this Court to fail to analyze the sections of HB 451 amending § 1445, regardless of how few times Plaintiffs directly mention § 1445 in their filings.

[192] Ans. Br. at 15 ("Section 1448(a)(5) is substantially related to the important government interest of protecting 18-to 20-year-olds [sic] from engaging in life-altering decisions and the public from gun violence as it is directed at preventing 18-to 20-year-olds [sic] from possessing and using firearms outside the supervision of an adult.").

[193] See Pls.' Opp'n to Defs.' Supp. Post-Argument Br. at 15-16 (outlining the test as set forth in Bridgeville, but only alleging that HB 451 fails to satisfy the first and third prong of intermediate scrutiny).

46

in their filings, the Court finds enough evidence in the record to show that preventing 18-to-20-year-olds from purchasing or possessing a firearm would necessarily relate to preventing them from committing firearm-related offenses. HB 451, however, does not restrict the purchase or possession of *all* firearms, exempting shotguns and muzzle-loading rifles.

In National Rifle Association of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, and Explosives, the Fifth Circuit found a federal law restricting the ability of "young persons under 21 to purchase handguns from [federal firearms licensees]" reasonably related to a congressional objective of "preventing such persons from acquiring handguns from [federal firearms licensees]."[194] In its analysis of the second prong of intermediate scrutiny, the Fifth Circuit highlighted that "Congress deliberately adopted a calibrated, compromise approach," by restricting the purchase of handguns as opposed to enacting a ban on all firearms.[195] The Fifth Circuit cited extensive data suggesting handguns were the primary weapon of choice in the exact type of criminal behavior Congress sought to curtail by passing the challenged law.[196] Defendants have not provided a similar body of evidence for this Court to consider.

---

[194] 700 F.3d at 209 (5th Cir. 2012), abrogated by Bruen, 597 U.S. at 142.

[195] Id.

[196] Id. at 209-10.

Nevertheless, the Court does not find the General Assembly's decision to take a somewhat less-restrictive approach to firearm regulation undermines HB 451's relation to its stated objective. In affording the General Assembly its due deference, the Court finds that restricting access to any class of firearm reasonably relates to the objective of decreasing firearm-related offenses. As Plaintiffs have not advanced an argument to the contrary, the Court finds Defendants have satisfied the second prong of intermediate scrutiny.

### III.  HB 451 burdens the fundamental right to bear arms in self-defense of 18-to-20-year-olds more than is reasonably necessary

The third and final prong of intermediate scrutiny instructs this Court to examine whether HB 451 has "not burdened the fundamental right to bear arms in self-defense more than is reasonably necessary to ensure the asserted governmental objectives are met."[197]  Defendants make several arguments that HB 451 satisfies that criteria: (1) "the ban here is not to prohibit an entire 'class of arms,' but to limit the class of people;" (2) HB 451 "does not prohibit those under the age of 21 years from using a firearm for recreation, like hunting or a sporting activity under the supervision of someone 21 years old or older;" (3) HB 451 does not prohibit the possession of shotguns; and (4) HB 451 allows for 18-to-20-year-olds to possess a

---

[197] Bridgeville, 176 A.3d at 656.

handgun "if they obtain a license to carry a concealed deadly weapon."[198] That quaternity of contentions fails to appreciate the scope of rights enshrined in Section 20, and, accordingly, does not satisfy the third prong of intermediate scrutiny.

### a. 18-to-20-year-olds, as adults, are entitled to the full protection of Section 20

Defendants draw a distinction between the ban effectuated by HB 451 and the one struck down in Heller, by asserting some difference between banning handguns for everyone and banning handguns only for a "class of people."[199] Defendants posit 18-to-20-year-olds are "not included in persons protected under Article I, Section 20 of the Delaware Constitution."[200] Defendants, in stating, "18-to 20-year-olds [sic] are not part of 'the people' in the Second Amendment or 'a person' in the Delaware Constitution," appear to advance the idea that 18-to-20-year-olds are not entitled to constitutional protections.[201] This argument fails because Defendants apply historical practices of exclusion from rights rather than a modern view of who qualifies as a "person."

Defendants argue:

---

[198] Ans. Br. at 16.

[199] Id.

[200] Id. at 18.

[201] Id. at 20.

> 18-to 20-year-olds [sic] historically would not have been included in the "people" language of Art. I, § 20 because infants did not possess the right to own or use firearms outside of their family structures. This is because the recognized age of majority in the colonial era in America through the adoption of the U.S. Constitution up until 1971 was 21 years old. This age of majority was adopted from the English common law tradition. And the Founding Era law analogized infants to those who did not possess a separate legal identity, such as *married women* or convicts.[202]

Aside from the inherent flaw in attempting to use antiquated views of who qualified as a "person" to justify the deprivation of rights, Defendants concede that, as of 1971, the recognized age of majority in the United States, Delaware included, is 18.[203] Section 20, passed in 1987, protects "reasonable, law-abiding adults."[204]

The inclusion of 18-to-20-year-olds as adults has been codified in Delaware since 1972 in 1 Del. C. § 701.[205] The drafters of Section 20, legislating over a decade after the passage of § 701, knew 18-to-20-year-olds would be entitled to the rights codified by Section 20, "unless otherwise provided." The drafters of Section 20 did

---

[202] Id. at 20-21 (emphasis added) (citations omitted).

[203] Id.; see U.S. Const. amend. XXVI ("The right of citizens of the United States, who are eighteen years of age or older, to vote shall not be denied or abridged by the United States or by any State on account of age.").

[204] Doe, 88 A.3d at 668.

[205] "A person of the age of 18 years or older on June 16, 1972, and any person who attains the age of 18 years thereafter, shall be deemed to be of full legal age for all purposes whatsoever and shall have the same duties, liabilities, responsibilities, *rights*[,] and legal capacity as persons heretofore acquired at 21 years of age unless otherwise provided." (emphasis added).

not "otherwise provide." Thus, Section 20 protects the rights of 18-to-20-year-olds to "keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use."

Defendants argue § 701, by virtue of its "unless otherwise provided" language, permits statutes that affect 18-to-20-year-olds differently from individuals who are at least "21 years of age." Defendants assert that language limits the application of § 701 "where a contrary statute exists."[206] HB 451 qualifies as a "contrary statute" given its express language limiting the rights of 18-to-20-year-olds, thus Defendants contend § 701 does not require a recognition of the Section 20 rights for that age range.[207]

Defendants' position would be correct in that, if Section 20 did not exist, HB 451 would permissibly "otherwise provide" that 18-to-20-year-olds are treated differently in the context of purchasing and possessing firearms. Section 20 does exist, however, and, as such, HB 451 must conform to its requirements. If the drafters of Section 20 intended to permit exceptions to the rights afforded adults based on different age-based subsections of the population, they could have done so. Absent an amendment to Section 20, its plain text coupled with the codified

---

[206] Ans. Br. at 18 (citing <u>Bartley v. Holden</u>, 338 A.2d 137, 141 n.4 (Del. Super. 1975)).

[207] <u>Id</u>.

understanding of the age of majority at the time of its adoption, confer the same rights to 18-year-olds as to 21-year-olds.[208]

Further evidence that 18-year-olds are legally considered adults can be found in the text of HB 451 itself. In amending 11 Del. C. § 1445(a)(4), HB 451 changes the phrase "child under 18" to "person under 21."[209] The alterations to 11 Del. C. § 1448(a)(5) include changing the word "juvenile" to "person under the age of 21."[210] In § 1448(f)(1), a person prohibited "who is 15 years of age or older, but not yet 18 years of age, is declared a child."[211] A person prohibited "who is 14 years of age or older, but not yet 18 years of age" must participate in an educational program implemented by the Division of Youth Rehabilitative Service.[212] In short, HB 451's changes to 11 Del. C. §§ 1445 and 1448 reflect an understanding that 18-year-olds are adults, but nevertheless attempts to restrict their rights as if they were still children – without affording the same protections or opportunities for rehabilitative services or protections as it provides those under the age of eighteen.

---

[208] It bears noting that Defendants could not point to any other right enshrined in the Delaware Constitution that does not attach at 18. Their attempt to analogize purchasing a gun to purchasing alcohol or tobacco – mirrored in the pretext of HB 451 – fails to recognize the difference between a right protected by the Delaware Constitution and a privilege conferred by statute.

[209] Amend. Compl. Ex. A at 1.

[210] Id.

[211] Amend. Compl. Ex. A at 3.

[212] Id.; 11 Del. C. § 1448(g).

As a final point on the protection afforded to 18-to-20-year-olds, their inclusion on a list of "persons prohibited" stands out as atypical compared to the rest of that list.[213] Every other adult identified as a "person prohibited" contained in 11 Del. C. § 1448(a) requires some form of adjudication or other entanglement with the criminal justice system. Though compelling, Defendants' proffered evidence that 18-to-20-year-olds' brains are still developing – particularly regarding their decision making and self-control – still falls far short of the threshold required for the other categories of persons prohibited.

### b. Self-defense is a core right under Section 20

Defendants next posit that HB 451 does not burden the fundamental right to bear arms more than reasonably necessary because it "does not prohibit those under the age of 21 years from using a firearm for recreation, like hunting or a sporting activity under the supervision of someone 21 years or older."[214] Section 20 explicitly protects the right to "keep and bear arms" for hunting and recreational use. Neither party addressed whether the supervisory requirement infringes on the right of 18-to-20-year-olds to exercise their rights in that context. Assuming it does not,

---

[213] See, supra, n.189.

[214] Ans. Br. at 16.

Defendants' contention omits the other explicit protection in Section 20 – the "right to keep and bear arms for the defense of self, family, home and State."

A pre-existing right codified in Section 20 is "an individual's right to bear arms in self-defense."[215] That right "has existed since our State's founding and has always been regarded as an inalienable right.[216] Defendants have not argued HB 451 *does not* infringe on the rights of 18-to-20-year-olds to bear arms for self-defense. Bridgeville's application of intermediate scrutiny specifically highlighted that challenged statutes can only survive when the government shows they "have not burdened the fundamental right to bear arms in self-defense more than is reasonably necessary to ensure the asserted governmental objectives are met."[217] A statute does not qualify as constitutional by merely respecting *some* of the core rights enshrined in the Delaware Constitution – it must respect them *all*.

Defendants have failed to show HB 451 does not restrict the right to self-defense more than is reasonably necessary. Prohibiting the acquisition and possession of firearms "completely eviscerate[s]" the right to self-defense. Allowing

---

[215] Doe, 88 A.3d at 663 (explaining that although the 1791 Delaware state constitutional convention could not agree on specific language, "there was an apparent consensus among the delegates on an individual's right to bear arms in self-defense.").

[216] Bridgeville, 176 A.3d at 644.

[217] Id. at 656.

for some activities involving firearms – under the supervision of someone at least 21-years-old – does not obviate that evisceration of the right to self-defense.[218]

### c. Restricting access to the quintessential self-defense firearm infringes on the right to self-defense

Defendants assert that HB 451 permits 18-to-20-year-olds "to possession [sic] shotguns without qualifications."[219]  Defendants argue this caveat contributes to HB 451 not burdening Section 20 "more than is reasonably necessary."[220]  Curiously, Defendants make this assertion immediately after discussing how the handgun ban in Heller qualified as "a complete prohibition."[221]

Heller explained that handguns are "overwhelmingly chosen by American Society" for self-defense.[222]  The challenged law in Heller permitted the possession of other firearms.[223]  In response to the petitioners arguing the handgun ban could not be unconstitutional because it permitted the possession of other firearms, the Heller court held:

---

[218] Id. at 638 ("the State must preserve an avenue for carrying out Section 20's core purposes, which includes the right of possession of lawful firearms for self-defense, including outside the home.").

[219] Ans. Br. at 16.

[220] Id.

[221] Id.

[222] Heller, 554 U.S. at 628.

[223] Id.

It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) is allowed. It is enough to note, as we have observed, that the American people have considered the handgun to be the quintessential self-defense weapon. There are many reasons that a citizen may prefer a handgun for home defense: It is easier to store in a location that is readily accessible in an emergency; it cannot be easily redirected or wrestled away by an attacker; it is easier to use for those without the upper-body strength to lift and aim a long gun; it can be pointed at a burglar with one hand while the other hand dials the police. Whatever the reason, handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid.[224]

Bridgeville and Doe concerned bans on all classes of firearms, and so did not have occasion to adopt Heller's view on handguns formally. In Bridgeville, the Delaware Supreme Court examined Wrenn v. District of Colombia,[225] and noted, "the D.C. Circuit persuasively explained that, 'by declining to apply tiers of scrutiny to a total ban on ownership, Heller closed off the possibility that courts would erroneously find some benefits weighty enough to justify other effective bans on the right to keep common arms.'"[226] Though perhaps not an explicit adoption, Bridgeville appears to harmonize with Heller in holding that handguns are

---

[224] Id.

[225] 864 F.3d 650, 655 (D.C. Cir. 2017).

[226] Bridgeville, 176 A.3d at 653 (quoting Wrenn, 864 F.3d at 665).

inexorably intertwined with the right to self-defense. Regardless, this Court is persuaded of that entwinement for the same reasons articulated in Heller.

> **d.    The exception for those holding a concealed carry permit does not adequately protect the right to self-defense**

Defendants' final argument in support of HB 451 stems from exemptions carved out in 11 Del. C. § 1448(a)(5)(b).[227] Those exemptions apply to "persons 18 years of age or older" who are: (1) active members of the Armed Forces or the National Guard; (2) a qualified law-enforcement officer as defined by statute; or (3) licensed "to carry a concealed deadly weapon pursuant to § 1441 of this title."[228] Defendants point to the third exemption as evidence HB 451 does not burden the fundamental right to bear arms more than is reasonably necessary.[229]

Plaintiffs addressed the third exemption in their Amended Complaint, positing it "requires prospective permit holders to comply with a vague, arbitrary, discretionary, and burdensome registration and licensing process."[230] "Delaware is an 'open carry' state."[231] When discussing Delaware's history of permitting open carry or concealed carry, the Bridgeville court explained:

---

[227] Ans. Br. at 16.

[228] Amend. Compl. Ex. A at 3.

[229] Ans. Br. at 16.

[230] Am. Compl. at 18.

[231] Doe, 88 A.3d at 663.

57

> Delaware has always permitted some meaningful avenue to exercise the right to bear arms, whether that avenue be through open carry or concealed. The crucial fact here is that the Regulations allow for neither. Further, the better reading of the historical precedents shows that states have had flexibility to favor either mode (open or concealed carry) or both, and have run afoul of constitutionally[-] protected rights to bear arms when they have banned both – as the Regulations do here.[232]

Ordinarily, individuals are free to open carry without any permit, but must apply for a license if they wish to concealed carry. 11 Del. C. § 1441 sets forth the procedure for obtaining a license to concealed carry. First, an applicant must qualify as "a person of full age and good moral character."[233] Those terms are not defined. Presumably, under 1 Del. C. § 701, a person of full age refers to someone at least 18-years-old, but "good moral character" appears entirely subjective. The applicant must also "file, with the Prothonotary, a certificate of 5 respectable citizens of the county in which the applicant resides at the time of filing the application."[234] Those five "respectable citizens" must agree:

---

[232] Bridgeville,176 A.3d at 644 n.58.

[233] 11 Del. C. § 1441(a).

[234] 11 Del. C. § 1441(a)(2).

That the applicant is a person of full age, sobriety and good moral character[;] that the applicant bears a good reputation for peace and good order in the community in which the applicant resides[;] and that the carrying of a concealed deadly weapon by the applicant is necessary for the protection of the applicant or the applicant's property, or both.[235]

Assuming the applicant can collect five such signatures, she must also complete an approved firearms training course[236] and pay a $65 fee.[237] If an applicant meets all of the aforementioned criteria, her application will be considered by this Court.[238] "The Court may or *may not, in its discretion*, approve any application."[239]

The concealed carry statute's plain text conveys the process is discretionary.[240] The exercise of a constitutionally-protected right cannot be reliant on a discretionary

---

[235] Id.

[236] 11 Del. C. § 1441(a)(3).

[237] 11 Del. C. § 1441(a)(4).

[238] 11 Del. C. § 1441(c).

[239] 11 Del. C. S 1441(d) (emphasis added).

[240] Bruen described Delaware's permitting structure as one having "discretionary criteria but appears to operate like 'shall issue' jurisdictions." Bruen, 597 U.S. at 15 n.1. The Bruen court based that description on statistics showing "the State has thus far processed 5,680 license applications and renewals in fiscal year 2022 and has denied only 112. Moreover, Delaware appears to have no licensing requirement for open carry." Id. Even assuming, as it appears the Bruen court did, that every applicant who meets the criteria for a concealed carry license is approved, the criteria plainly contain discretionary elements. Aside from the ambiguous "full age and good moral character" requirement, the five "respectable citizens" must certify "that the carrying of a concealed deadly weapon by the applicant is necessary." 11 Del. C. § 1441(a)(2). The questionnaire the "respectable citizens" must complete asks "has the applicant ever exhibited

licensing procedure. That premise particularly applies where, as is the case with an application for a concealed carry permit, an applicant who receives a denial has no appellate options.[241] An 18-to-20-year-old applying for a concealed carry permit, after fulfilling all requirements, may be denied without any recourse to have her constitutional right to possess a firearm for self-defense restored to her.[242] A constitutional right that may only be exercised at the discretion of the Court, with no appellate process should the Court err, is effectively no right at all. Accordingly, the exemption for individuals with a concealed carry permit does not salvage the unconstitutionality of HB 451.

---

a propensity for violence which may reasonably render applicant's possession of a handgun a danger to applicant or other law abiding [sic] citizens" and "do you know any reason why the applicant should not be given a license to carry a concealed deadly weapon." It further requires "you must be aware of the reason why this applicant has applied for a license to carry a concealed deadly weapon: for personal protection or protection of the person's property, or both. Please state the reason." See *Superior Court of the State of Delaware Reference Questionnaire* (Aug.18, 2025), https://courts.delaware.gov/Forms/Download.aspx?id=33218. The "respectable citizens" must have known the applicant for at least one year, and cannot be a relative or reside at the same address. Id.

[241] Application of Buresch, 672 A.2d 64, 66 (Del. 1996) ("The gun permit proceeding under 11 Del. C. § 1441 is essentially *ex parte* and discretionary, although the Superior Court 'may' receive evidence in opposition to the application. The statute fixes no standard for granting or denial of an application, and[,] while a rejected applicant may feel aggrieved[,] there is no underlying civil right which has been adjudicated.").

[242] Additionally, 11 Del. C. § 1441 does not require the Court to state its reasons for denying an application.

**V.** **Conclusion**

Article I, Section 20 of the Delaware Constitution enshrined the right of citizens to "keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use." At a minimum, some provisions of HB 451 infringe on the right of a subsection of adults, aged eighteen to twenty, to exercise their right to "defense of self, family, home and State." Accordingly, those provisions violate the Delaware Constitution and are unenforceable. HB 451's provisions that do not affect the rights of 18-to-20-year-olds – such as those outlining the rehabilitative services offered to those under the age of eighteen – remain intact. Plaintiffs' Motion for Summary Judgment is **GRANTED,** and Defendants' Cross-Motion for Summary Judgment is **DENIED.**

IT IS SO ORDERED.

_____
Reneta L. Green-Streett, Judge